No. 95,672

STATE OF KANSAS, *Appellee*, v. PAUL D. DRAYTON, *Appellant.*
(175 P.3d 861)

Opinion filed February 1, 2008.

*Sarah Ellen Johnson,* of Capital Appellate Defender Office, argued the cause and was on the brief for appellant.

*Boyd K. Isherwood,* assistant district attorney, argued the cause, and *Nola Tedesco Foulston,* district attorney, and *Paul J. Morrison,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

NUSS, J.: Paul Drayton directly appeals his convictions of first-degree murder and felony theft. Our jurisdiction is under K.S.A. 22-3601(b)(1), conviction of an off-grid crime.

The issues on appeal, and this court's accompanying holdings, are as follows:

1. Did the State violate an order in limine by introducing testimony suggesting Drayton was incarcerated when detectives interviewed him? No.

2. Did the district court commit reversible error in allowing a police detective essentially to testify that, were he innocent, he would have responded to police questioning differently than Drayton did? No.

3. Did the prosecutor commit reversible error by eliciting testimony from a police detective that Drayton had invoked his right to silence and by using that invocation to impeach his credibility in closing argument? No.

4. Was the evidence insufficient to support a theft conviction because the State could not prove that the murder victim, who owned the van, was alive at the time of its taking? No.

5. Did the district court err in ordering Drayton to reimburse BIDS for attorney fees in the amount of $7,110, when it essentially found that he would not have the financial ability to pay? Yes.

Accordingly, we affirm the convictions but reverse the district court's attorney fees assessment.

## FACTS

Paul Drayton was released from the Sedgwick County Adult Detention Facility on May 30, 2002. That same day he visited a friend,

James Mayberry. After the two men engaged in sexual relations, Drayton discarded his condom in a trash can in Mayberry's bathroom.

The next day, a large blue plastic grocery/trash bag was found by the Magetti family near their curb in Wichita, approximately 2 to 3 miles from Mayberry's house. While they first saw it as they were leaving for work at approximately 8 a.m., they did not look more closely until returning home at approximately 4 p.m. Upon seeing the contents, the Magettis called the police.

The police found that the bag contained two knives with dried blood, wadded bloody paper towels, a used condom, and a wallet containing Mayberry's driver's license but no money. The police then went to Mayberry's house. They found no sign of forced entry but did find Mayberry nude, bloodied, and dead in his bed, with multiple wounds to his neck and chest. In the bedroom was a box of condoms and a roll of paper towels, like those found in the grocery/trash bag. The police noted that Mayberry's van was missing, which they later found—with the key in the ignition—a few blocks from the Magettis' house. The van had been seen there with its lights on as early as 4 a.m. that day by a neighborhood resident.

DNA profiles were later obtained from the condom found in the bag. Most of the DNA from the condom exterior proved to be Mayberry's, while the DNA profile from the semen in the condom interior was found to be a possible match to Drayton.

Approximately 18 months later, in December 2003, Wichita Police Detective Kelly Otis traveled with Detective Mark Gantt to interview Drayton in Texas where he was incarcerated for another crime. After Detective Otis advised Drayton of his rights, he agreed to speak with Otis. After approximately 50 minutes of interviewing, Drayton requested that it end.

A buccal swab was taken from Drayton after the interview. The DNA from that swab was matched to the profile of Drayton earlier obtained from the used condom. Drayton was then charged with first-degree murder and felony theft.

At trial, the coroner established that Mayberry died from multiple stab wounds to the neck and chest. The DNA samples from

the condom were introduced and established as those of Mayberry and Drayton.

John Bailey, a mutual friend of Drayton and Mayberry, testified that in July 2002, a few months after the murder, Drayton telephoned him. When Bailey advised Drayton that Mayberry had been murdered, Drayton replied that he had not been in Wichita that weekend and asked that Bailey not tell anyone where he was.

Detective Otis testified that during the Texas interview with Drayton:

1. Drayton stated initially that he went straight from the county detention facility to the bus station and directly to Texas, without stopping to visit anyone in Wichita. Upon further questioning, however, Drayton then admitted that he had visited Mayberry.

2. Drayton said Mayberry had been sick, they had talked about a friend, and Mayberry then showed him Mayberry's recently acquired used van. Initially Drayton said he just looked at the van from the outside. After Otis falsely told Drayton that his fingerprints had been found inside the van on the steering wheel, however, Drayton then admitted that he had sat in the driver's seat but had not driven it.

3. Drayton said he left Mayberry's house the evening of his visit, walked the few miles to the bus station, and took the 11 p.m. bus to Dallas.

4. Drayton said that he and Mayberry had no sexual contact, asserting that he (Drayton) "was not that way."

5. Drayton did not say whether he was aware that Mayberry had been killed (Otis eventually told him that Mayberry had been), nor did Drayton ask Otis why he had come to Texas to interview him.

6. When Drayton asked for an attorney, Otis ended the interview. But Drayton then volunteered: "I don't know why you think I would kill him, I had my own money." However, neither Mayberry's wallet nor possibly missing money had been mentioned during the interview.

After Drayton's objection to Otis' testimony about the Texas interview was again overruled, Drayton then testified:

1. He did have sex with Mayberry during his visit on May 30, 2002. He had not admitted this conduct to Detective Otis during the Texas interview because he was very private about his sexuality.

2. He had left Mayberry's house around 7 p.m., and Mayberry was not feeling well when he left. He had walked the few miles back to the bus station, spent the night in and around that station, and left on the 11 a.m. bus the next day for Dallas.

3. He often got a.m. and p.m. mixed up, but he had told Otis during the Texas interview that he had left Wichita on a bus at 11, without specifying either a.m. or p.m.

A contractor for Greyhound Bus Lines in Wichita testified that when Drayton traveled from Wichita to Dallas in May 2002, only three buses made that trip. They left Wichita at 5:15 a.m., 12:25 p.m., and 5:45 p.m.

Drayton was convicted and sentenced to life imprisonment without the possibility of parole for 25 years for first-degree murder and 7 months' imprisonment for theft, to be served consecutively.

Additional facts will be provided as necessary to the analysis.

## ANALYSIS

Issue 1: *The State did not violate an order in limine by introducing testimony suggesting Drayton was incarcerated when detectives interviewed him.*

Drayton's brief asserts that the State violated an order in limine when Otis referenced the Texas facility and its guards in his testimony and that the violation constitutes reversible error. The State responds that the issue has not been preserved for appeal because Drayton did not object at trial to Otis' references. See *State v. Decker*, 275 Kan. 502, 507, 66 P.3d 915 (2003) (if a party's motion in limine is granted to exclude the admission of certain evidence at trial, but the party does not object to the admission of such evidence at trial, then the issue is not preserved on appeal). In the alternative, the State argues that any error was harmless.

We agree with the State that the issue has not been preserved for appeal. While Drayton tried to avoid the trial objection requirement by reframing the issue at oral arguments as prosecutorial misconduct, we will not accept this late characterization.

Even if the issue were preserved for appeal, we hold that no order violation occurred; even if so, it caused no substantial prejudice to Drayton. See *State v. Gleason*, 277 Kan. 624, 640, 88 P.3d

218 (2004) (" 'We employ a two-part test to evaluate alleged violations of a motion in limine: [1] Was there a violation of the order in limine and [2] if the order in limine was violated, did the testimony substantially prejudice the defendant?' ").

*No order violation*

Drayton's actual motion in limine requests an order "restricting the State from admitting certain evidence . . .

"1. That the Defendant's prior criminal record . . . is immaterial, irrelevant, and inadmissible for the purpose of impairing his credibility as a witness . . . pursuant to K.S.A. 60-421.

"Furthermore, any evidence of a trait of the Defendant's character as tending to prove his guilt of any of the offenses charged, if offered by the State to prove guilt, may only be admitted after the Defendant has introduced evidence of his good character pursuant to K.S.A. 60-447(b)(ii). If such information were made known to the jury, it would be improper, unduly prejudicial and erroneous. Moreover, the prejudice and harm could not be erased by the court sustaining an objection and/or instructing the jury to disregard such evidence.

"3. The State has not filed a motion pursuant to K.S.A. 60-455 for the purposes of admitting into evidence *the Defendant's prior criminal history.* Any attempt to admit the same at trial would be substantially prejudicial to the Defendant and such could not be erased by the court sustaining an objection and/or instructing the jury not to consider evidence of *any prior criminal history.*" (Emphasis added.)

There is no written order contained in the record on appeal, but later discussion of the actual motion consisted of this very brief exchange:

"THE COURT: Anything else? You had one, Mr. Brown [Drayton's Attorney]?
"MR. BROWN: Motion in limine for us, *going into what he was convicted of.*
"THE COURT: Motion in limine then to follow the law.
"MR. BROWN: Unless I let the cat out of the bag." (Emphasis added.)

The following exchange about the Texas interview occurred during direct examination of Otis during the State's case-in-chief:

"Q: And could you explain to the jury this interview that you had with Mr. Drayton? What was the size of the room?
"A: The room was—I don't know what its official name was—it was almost like a dayroom or *visiting room.*
"Q: Okay.

"A: It consisted of several tables, vending machines. The room was probably slightly larger maybe than this courtroom. The room at the time of the interview was empty. *The guards had allowed us to have access to that room in the facility.* We interviewed Mr. Drayton in that room. It was like a lunchroom." (Emphasis added.)

Drayton points to the italicized words and asserts that by mentioning "guards" and using the terms "visiting room" and "facility," Detective Otis "violated the order in limine by indirectly informing the jury that Mr. Drayton was in a secure facility with guards at the time of the interview" to convey that Drayton was in jail. He also asserts that the State, recognizing the impact of such information, agreed to keep this evidence out. Drayton references a specific conversation among the attorneys and the court in support.

That conversation, which occurred on the first day of trial shortly before the discussion of the motion in limine, consisted of the following brief exchange:

"MR. BROWN [Drayton's attorney]: We also have the situation where they interviewed him in the Texas penal facility.

"THE COURT: *I think you can just say they went to Texas and interviewed him at such and such.*

"MS. PARKER [State's attorney]: The big issue—*I think we can do that we interviewed him in Texas in a room.* The real issue for us, I think, is the time of his release [much earlier, from the Kansas Department of Corrections], we have a witness. And I don't know." (Emphasis added.)

Based upon Otis' testimony, the written motion and apparent oral order in limine, and the ensuing discussion, we are unable to conclude that any order in limine was violated. Otis' testimony does not address Drayton's prior criminal history or what he was convicted of. While the State arguably agreed to simply state he had been interviewed in a Texas room, and while "guards" and "facility" were indeed mentioned in one instance, Otis also testified he was in a room like a dayroom, a visiting room, or a lunchroom with several tables and vending machines.

### No substantial prejudice

Even assuming an order violation, Drayton must show that it caused him substantial prejudice. See *State v. Gleason,* 277 Kan. at 640. Errors that do not affirmatively cause prejudice to the sub-

stantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Voyles*, 284 Kan. 239, 252, 160 P.3d 794 (2007); see K.S.A. 60-261.

Drayton assumes that the jury learned from the testimony that he was in jail in Texas. He asserts that this could have led the jury to the incorrect inference that since he had been in jail before, he was more likely to be guilty of the present offense. He concludes that "[i]t cannot be said that the jury's knowledge that Mr. Drayton had been in jail in Texas did not contribute to the jury's verdict in this case."

Drayton has not demonstrated, however, that the jury knew of his incarceration in Texas. But it did hear evidence that Drayton had been released from the Sedgwick County Adult Detention Facility the same day as Mayberry's murder. It also heard Drayton himself testify that he had been "incarcerated for some time" and associated with "drug dealers and gang bangers." If error occurred, its consequences did not substantially prejudice Drayton.

*Issue 2: The district court did not commit reversible error in allowing a police detective essentially to testify that, were he innocent, he would have responded to police questioning differently than Drayton did.*

Drayton next argues that Detective Otis was improperly allowed to express his opinion on what he found "unusual" about the differences between Drayton's Texas statement and his later trial testimony. The State essentially responds no error occurred and, if so, it was harmless.

For our standard of review, this court has stated:

"[E]videntiary rules governing admission and exclusion may be applied either as a matter of law or in the exercise of the district judge's discretion, depending on the contours of the rule in question. When the adequacy of the legal basis of a district judge's decision on admission or exclusion of evidence is questioned, an appellate court reviews the decision de novo." *State v. Gunby*, 282 Kan. 39, Syl. ¶ 2, 144 P.3d 647 (2006).

After Otis testified in detail about the differences between Drayton's stories, he was briefly cross-examined:

"Q. And it [the Texas interview] lasted only about 50 minutes?

"A. Yes, sir.
"Q. And then the interview was terminated?
"A. That is correct.
"Q. Nothing *unusual* about that—I mean, a person doesn't have to talk to you?
"A. That's correct." (Emphasis added.)

Otis was then examined on redirect. The State's brief characterizes Otis' redirect testimony as his finding "it unusual that a suspect would partake in an interview, but not provide all the information he felt would be helpful to the investigation, especially information tending to deflect suspicion of his involvement":

"Q. You were asked if you found anything *unusual* about this interview. And in light of [Drayton's] testimony yesterday, do you find anything *unusual* about this interview?
"A. I certainly do.
"Q. And what is that?
      "MR. BROWN: Your honor, I'll object, foundation, as far as him giving an opinion about this interview being *unusual*.
      "THE COURT: Overruled.
      "MR. BROWN: All right.
"A. I found it *unusual* yesterday, it would be—*It seems to me that, if someone were asking me questions about a homicide, and the questions became pointed to the level that I felt that I was possibly being accused of that homicide, that the person possibly being accused would not* [sic] *be completely truthful if he were not involved in the death of that person, that he would not* [sic] *tell or give the police a statement that could be followed up that could possibly remove him of suspicion. I felt that, after yesterday's testimony by Mr. Drayton, that it would have been possibly embarrassing for him to admit to having sex with a victim, however, it certainly could have shed a light on some evidence that was located. And I don't know why he wouldn't have told me that at the beginning.*
      "MS. PARKER: Thank you. No further questions.
      "MR. BROWN: No, I don't have any recross. Thank you." (Emphasis added.)

*No opening the door*

The State first argues that Drayton's counsel opened the line of questioning as to the unusualness of Drayton's testimony by asking Otis to express his opinion about it. See *State v. Johnson*, 258 Kan. 475, 481, 905 P.2d 94 (1995) (when a defendant opens an otherwise inadmissible area of evidence during examination of witnesses, the prosecution may then present evidence in that formerly for-

bidden sphere); see also *State v. Fisher*, 283 Kan. 272, 311, 154 P.3d 455 (2007) (same).

We disagree with the State. The "nothing unusual" the defense was discussing concerned Drayton's termination of the interview because he did not have to talk to Otis. That is quite different from the "unusualness" the prosecutor then explored, *i.e.*, the unusualness of what Drayton did or did not say in Texas and inviting Otis' opinion as to why.

Having rejected the State's first attempt to prevail on this issue, we must now determine whether the admission of the challenged testimony should be reviewed as a matter of law or as a question of discretion. *Gunby*, 282 Kan. 39, Syl. ¶ 2.

*Opinion on credibility and guilt*

Otis' testimony can be construed as an opinion on the credibility of Drayton as a witness. We have held that a witness may not express an opinion on the credibility of another witness. *State v. Jackson*, 239 Kan. 463, 470, 721 P.2d 232 (1986). This is because the determination of the truthfulness of a witness is for the jury. *State v. Plaskett*, 271 Kan. 995, 1009, 27 P.3d 890 (2001); *State v. Manning*, 270 Kan. 674, 698, 19 P.3d 84 (2001); see *State v. Lash*, 237 Kan. 384, 386, 699 P.2d 49 (1985).

Asking for a witness' opinion on another witness' credibility, even if done indirectly, as here, is still improper. The case of *State v. Mullins*, 267 Kan. 84, 977 P.2d 931 (1999), provides guidance. There, the following colloquy occurred between the prosecutor and a nurse who had examined the sexual abuse minor victim:

"Q. [Mr. Cahill] Okay. Was there anything about that evaluation that caused you to be concerned that there might *be coaching or that* [victim] *in some way would be making this up? Anything inconsistent in his statements regarding that?*

. . . .

"MR. REARDON: I object to this on the basis she can't be a human lie detector as to whether or not the child was telling the truth.

"MR. CAHILL: That's not what I am asking. Asking if anything led her to be concerned about *the statements in that area that were inconsistent.*

"THE COURT: I will allow it. Go ahead.

"Q. [Mr. Cahill] go ahead and answer it.

"A. [Phillips] *I thought he had been coached?*

"Q. [Mr. Cahill] *Right. Any indication of that kind of behavior?*

"A. [Phillips] *No.*" (Emphasis added.) 267 Kan. at 93.

The *Mullins* court held that when the nurse was asked whether the sexual abuse victim was coached, this was another way of asking if he was telling the truth. The court held that the line of inquiry was improper "and the trial court erred in allowing the question to be answered." 267 Kan. at 97.

It is even more clear that Otis' testimony can be construed as an opinion on the often closely related issue of Drayton's guilt or innocence, *i.e.*, "In my opinion, an innocent person would have told me the truth at the outset." Opinions on guilt or innocence are improper. *State v. Jackson,* 239 Kan. at 470 ("[W]e think it was error for the trial court to permit the witnesses to testify and tell the jury that in their opinions the defendant committed the acts of molestation with which he was charged.").

This court's opinion in *State v. Steadman,* 253 Kan. 297, 855 P.2d 919 (1993), is of guidance. There, this court reversed the murder and robbery convictions and remanded for new trial because one detective was allowed to testify that in his opinion, defendant killed the victim and only guilty suspects feel the enormous pressure defendant exhibited during the interrogation at the police department. A second detective testified that he thought defendant was guilty because, among other things, other suspects were " 'honest' " and not guilty of the crime. 253 Kan. at 300, 303-04. Just as the *Steadman* detective was prohibited from opining that only guilty subjects feel the enormous pressure the defendant exhibited during the interrogation, Detective Otis was prohibited from opining that it was unusual for a suspect "to not provide all the information he felt would be helpful to the investigation, especially information tending to deflect suspicion of his involvement."

In light of our prior decisions, we conclude that the district court had no discretion on whether to allow Detective Otis to express his opinion on Drayton's credibility or on his guilt or innocence. That opinion testimony is inadmissible as a matter of law. See *State v. Elnicki,* 279 Kan. 47, 53-54, 105 P.3d 1222 (2005) (trial court has no discretion on whether to allow witness to express an opinion

on the credibility of another witness; such evidence is inadmissible as a matter of law); *State v. Steadman,* 253 Kan. at 304 (without citing standard, court held that police witnesses *"cannot* testify that in their opinion the defendant was guilty of the crime").

Otis' status as a police detective, whether qualified as an expert or not, does not affect this holding. Expert witnesses are similarly prohibited from expressing opinions on witness credibility or the defendant's guilt. See *State v. Jackson,* 239 Kan. at 470 (error to permit expert witnesses to testify that in their opinions the child victim was telling the truth and defendant committed the acts of molestation with which he was charged); *State v. Lash,* 237 Kan. at 386 (psychologist could not testify as to his expert opinion that the alleged victim had been sexually molested by defendant because it called for opinion as to whether victim was telling the truth that his father was the molester: requires expert to pass upon the credibility of witnesses or the weight of disputed evidence); see also *State v. Plaskett,* 271 Kan. at 1008-09 (error in allowing detective to express opinion as to whether victim was telling the truth); *State v. Steadman,* 253 Kan. at 304 (police witnesses "cannot testify that in their opinion the defendant was guilty of the crime").

Now that we have determined it was error to admit this evidence, we turn to the magnitude of the error, *i.e.,* whether it was harmless or reversible. See, *e.g., State v. Mullins,* 267 Kan. at 97.

*Harmless error*

Errors that do not affirmatively cause prejudice to the substantial rights of a complaining party do not require reversal when substantial justice has been done. *State v. Voyles,* 284 Kan. at 252; see K.S.A. 60-261. Among other things, this court specifically considers whether the error is of such a nature as to affect the outcome of the trial. See *State v. Englehardt,* 280 Kan. 113, 130, 119 P.3d 1148 (2005) (reversal is required only where an erroneous admission of evidence is of such a nature as to affect the outcome of the trial and deny substantial justice).

The record reflects that the DNA of both Mayberry, as victim, and Drayton were found on the used condom the day after May-

berry's death. Bailey testified that after Drayton telephoned him and Bailey informed him Mayberry had been murdered, Drayton volunteered that he had not been in Wichita that weekend and asked Bailey not to tell anyone where he was. Moreover, Detective Otis testified that Drayton never asked him why he had come all the way from Wichita to Texas for the interview. While nothing had been said in the interview about Mayberry's missing wallet or any money missing from it, when the interview terminated Drayton then volunteered, "I don't know why you think I would kill him, I had my own money."

Additionally, Drayton's stories frequently changed, revealing not only substantial inconsistencies often disfavored by juries but also establishing substantive evidence of his guilt. Although he first told Otis he had gone straight from the detention facility to the bus station, he then admitted he had visited Mayberry between those two stops; the police found no evidence of forced entry into Mayberry's apartment where his body was found. While he first told Otis he had merely looked at Mayberry's newly acquired van from the outside, when told his fingerprints had been found on the steering wheel, he then admitted he had sat in the driver's seat—but had not driven it. The van was then found, with the key in the ignition, the day after the murder, in the same neighborhood as the bag containing the bloody knives and towels.

According to Otis, Drayton first told Otis he had taken the 11 p.m. bus to Dallas; at trial Drayton testified he left on the 11 a.m. bus, explaining he often got a.m. and p.m. mixed up but had simply told Otis he had left at 11. A bus company contractor testified in contradiction: there had been no bus at either 11 a.m. or 11 p.m. Additionally, while Drayton first told Otis he had no sexual contact with Mayberry, at trial he testified that they did have sex the day before Mayberry's body was found. The used condom containing their DNA was found the day after Mayberry's death in the bag with bloody knives and towels not too far from where Mayberry's van was then found, with the key in the ignition, several miles from the murder scene. It is highly likely that the person who took the time to remove the used condom from the murder scene and dis-

card it at this far location was the same person whose inculpatory DNA was on it.

Finally, Drayton's narrow window of freedom in Wichita—from when he was released from the detention facility until he said that he left on the bus for Dallas—was within the same time frame as when Mayberry was killed.

Based upon this evidence, we conclude that any error was harmless: Otis' improper testimony did not affect the outcome of the trial and deny substantial justice.

Issue 3: *The prosecutor did not commit reversible error by eliciting testimony from a police detective that Drayton had invoked his right to silence and by using that invocation to impeach his credibility in closing argument.*

Drayton argues that the prosecutor committed reversible misconduct when, in violation of *Doyle v. Ohio*, 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (1976), he improperly impeached Drayton with Drayton's post-*Miranda* silence. Specifically, the prosecutor twice elicited testimony from Detective Otis that Drayton had invoked his right to silence, and the prosecutor commented on this invocation during closing argument. Among other things, the State responds that the issue of a *Doyle* violation is not preserved for appeal because Drayton admits that he failed to make contemporaneous objections at any time.

Historically this court has required a contemporaneous objection to preserve a *Doyle* violation for appeal. See *Fisher v. State*, 222 Kan. 76, Syl. ¶ 7, 563 P.2d 1012 (1977). Here, there clearly were no contemporaneous objections to any of the three alleged violations. However, the lack of a contemporaneous objection has not necessarily barred consideration of an appeal under a claim of prosecutorial misconduct. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261(2006). In *State v. Hernandez*, 284 Kan. 74, 79, 159 P.3d 950 (2007), we acknowledged a potential conflict between these two schools of thought where, as here, the defendant framed the alleged *Doyle* violations as instances of prosecutorial misconduct. Because Hernandez' trial counsel had raised an appropriate objec-

tion under *Doyle*, we did not otherwise address the possible tension. *Hernandez*, 284 Kan. at 79.

Similarly, today we do not decide the issue of whether a lack of a contemporaneous objection to evidence constituting a *Doyle* violation prevents the resultant argument on appeal of prosecutorial misconduct. We acknowledge that the State's brief cites *State v Sanchez*, 282 Kan. 307, 311, 144 P.3d 178 (2006), for the proposition that an appellate court does not review an alleged *Doyle* violation when defendant fails to raise a timely objection with the trial court. However, no real argument was made that we should not consider the *Doyle* issue on appeal until the State's letter under Supreme Court Rule 6.09 (2007 Kan. Ct. R. Annot. 45) discussing *Hernandez* was filed 2 days before oral arguments in this case. Like *Hernandez*, we leave resolution of this tension for another day, when the issue has been squarely presented and the parties have had sufficient opportunity to fully address it in their briefs, or to adequately prepare for it at oral arguments, or both. Accordingly, we will consider whether the now objected-to instances constitute prosecutorial misconduct. But first, we review the facts.

*The testimony and closing argument*

The first instance which allegedly shows that the State violated Drayton's right to silence was when the State was laying the foundation for Detective Otis to testify on direct examination about the Texas interview:

"Q. And did there come a time in your interview, after you had given him *Miranda*, that he decided that he wanted to stop talking to you?
"A. Yes.
"Q. Or he asked for a lawyer?
"A. He did.
"Q. Let's go through how you went through the *Miranda* form for the jury, please.
"A. Okay."

This exchange was followed by a lengthy detailed description of the process of reviewing with Drayton the *Miranda* rights form used by the Wichita police. Otis completed this form with Drayton before the actual substantive interview began. Otis testified that the form included, among other things, advice that "if you decide

to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have a right to stop answering at any time until you talk to a lawyer."

The second instance about which Drayton complains was later during the State's direct examination of Otis, again discussing the Texas interview:

"Q. Um, at some point the, was the interview ended by Drayton?
"A. It was.
"Q. And did you continue asking him questions after that time period?
"A. Once he asked for an attorney, the interview ended."

The third instance about which Drayton complains occurred during the State's rebuttal closing argument:

"And when you look at the evidence here, and you rate what's true and what's not true, and there is a lot of different things that Mr. Drayton said, and it's so convenient. Talk about speculation, is it not convenient to watch a case go on, watch several months, to see what the evidence is, then take the stand and change the story to have you speculate about some phantom person coming in and seeing Mr. Mayberry? Certainly not Mr. Drayton, because he was there and he had sex with him."

*Standard of review*

Our standard of review for allegations of prosecutorial misconduct was recently reiterated in *State v. White*, 284 Kan. 333, 337-38, 161 P.3d 208 (2007):

"Allegations of prosecutorial misconduct require a two-step analysis. First, the appellate court must determine whether the comments were outside the wide latitude [that the prosecutor is] allowed in discussing the evidence. Second, the appellate court must decide whether those comments constitute plain error; that is, whether the statements prejudiced the jury against the defendant and denied the defendant a fair trial, thereby requiring reversal. *State v. Elnicki*, 279 Kan. 47, 58, 105 P.3d 1222 (2005) (quoting *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 [2004]). We have applied the test to prosecutorial action in contexts beyond mere comment on the evidence. See *State v. Swinney*, 280 Kan. 768, 779, 127 P.3d 261 (2006) (citing cases)."

In the second step of the two-step analysis, this court considers three factors to determine whether a new trial should be granted:

"(1) whether the misconduct is gross and flagrant; (2) whether the misconduct shows ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would

likely have little weight in the minds of jurors. None of these three factors is individually controlling. Before the third factor can ever override the first two factors, an appellate court must be able to say that the harmlessness tests of both K.S.A. 60-261 (inconsistent with substantial justice) and *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824 (1967) [conclusion beyond reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial], have been met." *State v. White,* 284 Kan. at 338.

We begin our analysis of the *Doyle* issues with a short review. As we recently confirmed in *State v. Hernandez,* 284 Kan. 74, the use for impeachment purposes of defendant's silence, at the time of arrest and after receiving *Miranda* warnings, violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution. See *Doyle v. Ohio,* 426 U.S. 610; *State v. Mims,* 220 Kan. 726, 556 P.2d 387 (1976).

This same analysis applies even when, as here, the defendant first talks with officers after being *Mirandized* and then later invokes his right to silence. See *State v. Clark,* 223 Kan. 83, Syl. ¶ 2, 574 P.2d 174 (1977) (Accused may remain completely silent and is under no duty to volunteer his exculpatory story. Thus, he should be afforded the same right after some discussion with police when he remains silent as to matters later asserted at trial.).

This court has also held that it is a *Doyle* violation to elicit evidence that a defendant has invoked the right to remain silent:

"It is constitutionally impermissible for the State to elicit evidence at trial of an accused's post-*Miranda* silence [citing *Doyle*]. A *Doyle* violation occurs when the State attempts to impeach a defendant's credibility at trial by arguing or *by introducing evidence that the defendant did not avail himself or herself of the first opportunity to clear his or her name when confronted by police officers but instead invoked his or her constitutional right to remain silent. State v. Brinkley,* 256 Kan. 808, 820, 888 P.2d 819 (1995)." (Emphasis added.) *State v. Edwards,* 264 Kan. 177, 195, 955 P.2d 1276 (1998).

Clearly, the testimony of Detective Otis, twice making reference to Drayton's invocation of his rights, constitutes *Doyle* violations of the type mentioned in *Edwards.*

We next examine the prosecutor's statements in rebuttal closing argument. As discussed earlier, a *Doyle* violation can be committed in a number of ways, *e.g.,* a prosecutor's commenting on a defendant's postarrest silence or implying that a defendant had some ob-

ligation to reveal his or her trial testimony to police after being warned of his or her right to remain silent. *Hernandez*, 284 Kan. at 94. It is not a violation, however, to impeach a defendant's trial testimony through use of a prior inconsistent statement given after he or she was provided *Miranda* warnings. *State v. Falke*, 237 Kan. 668, 682, 703 P.2d 1362 (1985). The *Falke* court consequently held: "Therefore, when the defendant made a different statement at trial . . . the prosecutor could properly impeach him with his prior inconsistent statement. K.S.A. 60-422(b)." 237 Kan. at 682.

We conclude there was no *Doyle* violation in the closing argument. The prosecutor was not alluding to Drayton's invocation of silence, but rather his changed stories from Texas to trial: "[T]here is a lot of different things that Mr. Drayton said . . . . [I]s it not convenient to watch a case go on, watch several months, to see what the evidence is, then take the stand and change the story." Nor was there otherwise prosecutorial misconduct: the statements were not outside the wide latitude allowed in discussing evidence.

We now examine the magnitude of the error of allowing Otis' testimony.

*Harmless error*

Prosecutorial error does not necessarily amount to reversible error. Reversal is not required unless the prosecutor's actions deprived Drayton of a fair trial. *State v. Tosh*, 278 Kan. 83, 85, 91 P.3d 1204 (2004). The first factor to consider in the harmlessness inquiry is whether the misconduct is gross and flagrant, *i.e.*, did it prejudice the jury against Drayton. See *State v. Elnicki*, 279 Kan. at 65. We hold it did not.

The State tried to set the backdrop for Drayton's 50-minute interview by explaining, in detail, the *Miranda* rights form. Otis' first reference to Drayton's decision to stop talking came before both that discussion and the disclosure of the interview contents. Any alleged flagrancy was tempered by Otis' telling the jury soon thereafter that per the police's own *Miranda* rights form, Drayton absolutely had the right to stop answering questions at any time until he talked to a lawyer. Although Otis' second reference makes the decision more difficult, we are unable to conclude that the

conduct was gross and flagrant. Among other things, we note as part of our consideration that the State made no comments regarding this assertion of rights in closing arguments. *Cf. State v. Edwards*, 264 Kan. at 196.

As for ill will, we are unable to conclude that any was shown from the record. Although there were two references to Drayton's invocation of rights, we believe allegations of ill will also were tempered by Otis' telling the jury during that same direct examination by the State that Drayton absolutely had the right to stop answering questions at any time. Similarly, the absence of comments by the State during closing arguments regarding Drayton's assertions cuts against any claim of ill will.

Lastly, the evidence against Drayton was of such a direct and overwhelming nature that the error likely had little weight in the minds of the jurors. The specific evidence against him was discussed earlier in Issue 2. In addition, any harm that may have occurred was substantially reduced by Drayton's counsel's questions during Otis' cross-examination which drew the admission that Drayton was legitimately exercising his rights:

"Q. And [the interview] lasted only about 50 minutes?
"A. Yes, sir.
"Q. And then the interview was terminated?
"A. That is correct.
"Q. Nothing unusual about that—I mean, a person doesn't have to talk to you?
"A. That's correct.
"Q. You told him right upfront; did you not?
"A. That is right; you are correct.
"Q. And people exercise their rights?
"A. Absolutely.
"Q. All right. Thank you."

In conclusion, although the prosecutor erroneously elicited testimony violative of *Doyle,* reversal is not required because the prosecutor did not prejudice the jury against Drayton and deny him a fair trial. We hold that the harmlessness standards are satisfied from both K.S.A. 60-261 (not inconsistent with substantial justice) and *Chapman v. California*, 386 U.S. 18 (conclude beyond a reasonable doubt that the error had little, if any, likelihood of having changed the results of the trial).

Issue 4: *The evidence was sufficient to support a theft conviction.*

Drayton next argues that insufficient evidence exists to convict him of theft because at the time the van was taken Mayberry was already dead, *i.e.*, no longer the owner. The State primarily responds that a jury could have inferred from the evidence that Drayton completed the theft before Mayberry died. See *State v. Gibson*, 246 Kan. 298, 303, 787 P.2d 1176 (1990) (It is the jury's prerogative to determine the weight to be given the evidence and the reasonable inferences to be drawn from the evidence.).

### Standard of review

Our standard of review is well known:

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Burhans*, 277 Kan. 858, 871, 89 P.3d 629 (2004).

### The theft

The jury was instructed that in order to prove felony theft as charged under K.S.A. 21-3701(a)(1)(b)(2), the State had the burden to show:

(1) James Mayberry was the owner of the property—a wallet and the van;

(2) Drayton obtained or exerted unauthorized control over the property;

(3) Drayton intended to deprive James Mayberry permanently of the use or benefit of the property;

(4) The value of the properties was at least $500 but less than $25,000; and

(5) This act occurred on or about May 31, 2002, in Sedgwick County, Kansas.

Drayton challenges only the first element and specifically asserts that the evidence presented at trial was

"insufficient to convict Mr. Drayton of theft because James Mayberry was no longer the legal owner of the minivan at the time of its taking.

". . . At the moment of his death, property ownership of the minivan passed either to his intestate successors under K.S.A. 59-502 or to his estate pending execution of his will. . . . The state cannot prove beyond a reasonable doubt that Mr. Mayberry was still alive, and therefore [was] the owner of property, when the van was taken."

*Discussion*

We first observe that based upon the evidence presented, the jury may have rationally inferred that Drayton completed the theft before Mayberry died. See *State v. Ordway*, 261 Kan. 776, 804, 934 P.2d 94 (1997) ("If an inference is a reasonable one, the jury has the right to make the inference."); *State v. Bird*, 240 Kan. 288, 299, 729 P.2d 1136 (1986), *cert. denied* 481 U.S. 1055 (1987) (a conviction "can be based entirely on circumstantial evidence and the inferences fairly deducible therefrom"). In other words, a jury could have rationally inferred that within minutes of Mayberry's stabbing, and therefore while he was still alive, Drayton took his wallet and then his van to flee the crime scene.

The coroner testified that Mayberry's death was not instantaneous:

"Q. [Prosecutor:] And after doing this [the autopsy], were you able to determine what the cause of Mr. Mayberry's death was?
"A. Yes.
"Q. What was it?
"A. His cause of death is multiple stab wounds.
"Q. Were you able to determine, based on his injuries, how long it may have taken Mr. Mayberry to die?
"A. That would be difficult to estimate. He did have wounds to the aorta, but as long as they were small wounds, that the blood could still pump to the brain, until there would be enough time that the blood would then begin to go into the chest cavity causing his loss of blood and for him to go into shock. *So a matter of minutes, but I can't say how many minutes that would be.*
"Q. *But he would have been alive for a matter of minutes?*
"A. *Yes.*
"Q. And all these stab wounds to his neck and chest, was his airway cut or obstructed in any way?
"A. No." (Emphasis added.)

Even if the jury believed that Mayberry was dead at the time of the van's taking, we conclude that sufficient evidence existed for the jury to have found that murder and the theft were part of a

continuous chain of events. A similar situation occurred in *State v. Myers*, 230 Kan. 697, 640 P.2d 1245 (1983). There, the defendant was convicted of voluntary manslaughter, aggravated robbery, and arson. He shot the victim and then returned 3 hours later for the stated purpose of making sure the victim was dead. Upon returning to the location of the body, the defendant removed several items, including the victim's wallet and money.

Defendant argued on appeal that because the victim's wallet and money were taken from his body about 3 hours after he was killed, the property was not taken by force or threat of force and therefore these elements of aggravated robbery had not been established. See K.S.A. 21-3427. This court upheld the aggravated robbery conviction. 230 Kan. at 703-04. As this court later described in *State v. Adam*, 257 Kan. 693, 698, 896 P.2d 1022 (1995), the *Myers* court rejected defendant's contention that the crime required the threat or force to be concurrent with the taking of the property and his contention that the force must be used with intent to steal.

Relying in large part upon *People v. McGrath*, 62 Cal. App. 3d 82, 133 Cal. Rptr. 27 (1976), where convictions of murder and post-death theft were upheld because the crimes were part of one continuous transaction, the *Myers* court held:

"[W]here a defendant shoots his victim and later decides to take and remove the victim's personal belongings, *where the act of force and the taking of the property are so connected as to form a continuous chain of events so that the prior force makes it possible for the defendant to take the property from the victim's body without resistance, that is sufficient for a conviction of the crime of robbery under K.S.A. 21-3426.* Since the killing was accomplished with a dangerous weapon, a violation under K.S.A. 21-3427 was established by the evidence." (Emphasis added.) 230 Kan. at 703-04.

The case of *State v. Holt*, 260 Kan. 33, 917 P.2d 1332 (1996), provides additional guidance. There, the defendant was convicted of numerous offenses, including two counts of first-degree murder, aggravated burglary, aggravated robbery, and felony theft. Two of the victims were killed when their homes were burglarized and property taken. Among other things, on appeal defendant directly argued that the evidence of aggravated robbery was insufficient to convict him because there was no proof the victims were alive when

their property was taken. Accordingly, he argued that the property could not have been taken from their "presence" as the crime required. See K.S.A. 21-3426; K.S.A. 21-3427. The *Holt* court squarely rejected defendant's argument: "[T]he defendant is incorrect in asserting that the victim must be alive at the time the property was taken." 260 Kan. at 42.

Relying in large part upon *Myers*, the *Holt* court held that "the possibility that [the victims] were deceased by the time the taking was completed does not render the evidence of aggravated robbery insufficient. . . . [T]he act of force and bodily harm and the taking of the property from the victims were part of a continuous chain of events." 260 Kan. at 42.

The continuous chain of events, or continuous transaction, theory has been followed in a number of jurisdictions. See *Arthur v. State*, 735 So. 2d 213, 219-20 (Miss. 1999) (collecting cases). Maryland's highest court explained the rationale for its application of its rule in *Metheny v. State*, 359 Md. 576, 606, 755 A.2d 1088 (2000):

" 'If the force precedes the taking, the intent to steal need not coincide with the force. It is sufficient if there be force followed by a taking with intent to steal as part of the same general occurrence or episode. Even if the force results in death, a taking and asportation after the death is nevertheless robbery.'

". . . [A] *felon who applies force to neutralize a victim should be held responsible for that action if the felon later decides to take advantage of the situation by robbing the victim.* In essence, we have allowed, in such circumstances, for a constructive concurrence of the force and intent to steal at the time of the taking." (Emphasis added.)

We observe that several of the salient facts of the instant case are similar to those in *Myers:* intentionally causing death, through the use of a deadly weapon, followed within hours by the taking of the victim's property. In *Myers*, the robbery occurred 3 hours after death. In the instant case, the jury could have found that the theft occurred within 2 hours after death, as Drayton testified that he left Mayberry's house about 2 hours after arriving there, during which time they talked, Drayton had a drink, and the two had sex.

In short, after reviewing all of the evidence, viewed in the light most favorable to the prosecution, we are convinced that this ra-

tional jury could have found Drayton guilty of theft beyond a reasonable doubt.

Issue 5: *The district court erred in ordering Drayton to reimburse BIDS for attorney fees in the amount of $7,110, when it essentially found that he would not have the financial ability to pay.*

Finally, Drayton argues that the district court erred in assessing any attorney fees against him under K.S.A. 2006 Supp. 22-4513 because he had no ability to reimburse the Board of Indigents' Defense Services (BIDS). The State responds that when subsection (b) and (c) of K.S.A. 2006 Supp. 22-4513 are considered, the legislature anticipated that the defendant's rights would be protected by providing him the ability to petition the court to waive all or part of the fees or to modify the method of payment, if payment of the amount due would impose "manifest hardship" on the defendant or his immediate family.

The arguments necessitate statutory interpretation, a question of law over which this court exercises unlimited review. *State v. Rogers,* 282 Kan. 218, 222, 144 P.3d 625 (2006).

At the sentencing hearing the district court assessed BIDS attorney fees against Drayton. Then this exchange occurred:

"MR. BROWN [defense counsel]: Your honor, . . . would you take into consideration his financial condition in assessing $7,110 to avoid another hearing?
. . . .
"THE COURT: Well, *I will make it very clear, since he will be imprisoned for the next 25 years, that his financial condition does not make it likely that it will be paid by him or that he will have the ability to pay.* That's as far as I go. I think that should be sufficient for the purposes that you were seeking. Is that correct?
"MR. BROWN: Thank you, your honor." (Emphasis added.)

The statute at issue, K.S.A. 2006 Supp. 22-4513, requires a district court to order a convicted defendant to reimburse BIDS for attorney fees and other defense services. It states:

"(a) If the defendant is convicted, all expenditures made by the state board of indigents' defense services to provide counsel and other defense services to such defendant or the amount allowed by the board of indigents' defense reimbursement tables as provided in K.S.A. 22-4522, and amendments thereto, whichever is less, shall be taxed against the defendant and shall be enforced as judgments for payment of money in civil cases.

"(b) In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose. A defendant who has been required to pay such sum and who is not willfully in default in the payment thereof may at any time petition the court which sentenced the defendant to waive payment of such sum or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose hardship on the defendant or the defendant's immediate family, the court may waive payment of all or part of the amount due or modify the method of payment.

"(c) Whenever any judgment has been entered pursuant to subsection (a) of this section, a sum equal to such judgment may be recovered by the state of Kansas for the benefit of the state general fund from any persons to whom the indigent defendant shall have transferred any of the defendant's property without adequate monetary consideration after the commission of the alleged crime, to the extent of the value of such transfer, and such persons are hereby made liable to reimburse the state of Kansas with interest at 6% per annum. Any action to recover judgment for such expenditures shall be prosecuted by the attorney general, who may require the assistance of the county attorney of the county in which the action is to be filed, and such action shall be governed by the provisions of the code of civil procedure relating to actions for the recovery of money. No action shall be brought against any person under the provisions of this section to recover for sums expended on behalf of an indigent defendant, unless such action shall have been filed within two years after the date of the expenditure by the state board of indigents' defense services."

We addressed this statute in *State v. Robinson*, 281 Kan. 538, 132 P.3d 934 (2006), whose holding serves as the primary basis for our decision today. There, we held that these first two subsections of the statute set out four distinct—but logically and temporally related—provisions: (1) BIDS must be reimbursed, and fees to enable such reimbursement must be assessed against convicted defendants and enforced as civil judgments; (2) the sentencing court shall consider the defendant's financial circumstances in setting the amount and payment method of the fees; (3) once the fees are assessed, a defendant may petition for waiver of all or part of the fees; and (4) if such a petition is filed, the court will determine whether payment imposes "manifest hardship" on the defendant and his or her family and, if so, may waive or modify the amount or method of payment. 281 Kan. at 544.

We also held that regarding step 2, the statute "clearly requires a sentencing judge, 'in determining the *amount* and method of

payment' *of BIDS reimbursement, i.e.,* at the time the reimbursement is ordered, to 'take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose.' The language is mandatory; the legislature stated unequivocally that this 'shall' occur." (Emphasis added.) 281 Kan. at 543.

This same point was made several times more throughout the opinion. "[T]he sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly,* stating on the record how those factors have been weighed in the court's decision." 281 Kan. at 546.

The point was repeated in 281 Kan. at 547:

"[S]ubsection (a) of K.S.A. 22-4513 states that taxation of 'all expenditures' by BIDS shall occur and that neither subsection (a) nor subsection (b) explicitly states *consideration of a defendant's financial resources* must occur 'at sentencing.' However, reading the subsections together, this is their practical effect. *The consideration must occur,* and sentencing is the proceeding that routinely addresses BIDS reimbursement." (Emphasis added.)

As our holding in *Robinson* repeatedly made clear, in order to determine the amount of defendant's payment of BIDS reimbursement, at sentencing the court is required to take account of the defendant's financial resources and the nature of the burden that payment of such sum will impose explicitly. Moreover, the court must state on the record how those factors have been weighed in the court's decision, *i.e.,* determining how much of a fee, if any, to impose. Indeed, we stated that "[w]ithout an adequate record on these points, meaningful appellate review of whether the court abused its discretion *in setting the amount . . . of the fees would be impossible.*" (Emphasis added.) 281 Kan. at 546.

Here, there was no meaningful judicial consideration of these factors in determining the amount of the attorney fees that Drayton could afford to reimburse. The district judge's own finding indicates that Drayton essentially was unable to afford to reimburse any of the $7,110: "[S]ince he will be imprisoned for the next 25 years, . . . his financial condition does not make it likely that it

will be paid by him or that he will have the ability to pay. That's as far as I go."

Moreover, the Tenth Circuit Court of Appeals has held that when, as the district court found, a person is "unlikely to be able to pay," no requirement to pay is to be imposed. In *Olson v. James*, 603 F.2d 150, 155 (10th Cir. 1979), the Tenth Circuit struck down an earlier version of 22-4513 as constitutionally deficient under the United States Supreme Court decision in *Fuller v. Oregon*, 417 U.S. 40, 40 L. Ed. 2d 642, 94 S. Ct. 2116 (1974). It held:

"[A] court should not order a convicted person to pay these expenses [for court appointed counsel] unless he is able to pay them or will be able to pay them in the future considering his financial resources and the nature of the burden that payment will impose. *If a person is unlikely to be able to pay, no requirement to pay is to be imposed.*" (Emphasis added.) *Olson*, 603 F.2d at 155.

In *Robinson*, we noted that *Olson* required recoupment statutes to provide that a convicted defendant not be ordered to pay counsel expenses unless he or she was able to pay or would be able to pay them in the future, when available financial resources and the nature of the burden payment would impose were taken into account. 281 Kan. at 546. We further observed that after the *Olson* decision, our legislature amended the Kansas statute, essentially to its current form. See L. 1981, ch. 157, sec. 2. We held that the timing and substance of the amendment, nearly identical to the Oregon provision commented favorably upon by the *Fuller* Court, was "revealing about the intention behind the legislature's chosen language." 281 Kan. at 546. We concluded that "intention is borne out by the interpretation we give the statute today," *e.g.*, that a convicted defendant not be ordered to pay counsel expenses unless he or she was able to pay or would be able to pay in the future. See 281 Kan. at 546.

Despite these statements from *Robinson*, the State argues that when one couples subsection (c) with subsection (b), the legislature has announced its intent to allow the attorney general sufficient time to further investigate a defendant's financial status and his or her ability to repay, where the district court considered a defendant's ability to pay at the time of sentencing. Subsection (c) provides for a 2-year period in which the attorney general's office may

investigate any transfer of a defendant's property without adequate monetary consideration in order to recoup any moneys expended on behalf of an indigent defendant. Subsection (b), as noted, allows a defendant to petition for waiver at any time.

The primary problem with the State's position is that the *Robinson* court rejected a similar State's argument, *i.e.*, that Robinson's appeal was premature because subsection (b) specifically allows him to petition for waiver of the fees. We held: "[T]he fact that the statute also permits a defendant to petition for waiver does not change the mandatory language or mean the waiver procedure is intended as a substitute for the sentencing court's initial consideration of a defendant's finances." 281 Kan. at 544. Accordingly, the mandatory language requiring the district court's initial consideration at the time of sentencing must take priority over any subsequent rights or remedies available under the statute, to the attorney general or the defendant.

Drayton's convictions of murder and theft are affirmed. The district court's order assessing attorney fees against Drayton for reimbursement of BIDS fees is reversed.

DAVIS, J., not participating.

MCANANY, J., assigned.