No. 101,837

STATE OF KANSAS, *Appellee*, v. KEVIN HERNANDEZ, *Appellant*.

(257 P.3d 767)

Opinion filed July 29, 2011.

*Matthew J. Edge*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Barry R. Wilkerson*, county attorney, argued the cause, and *Bethany C. Fields*, deputy county attorney, and *Steve Six*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: Kevin Hernandez was convicted of premeditated first-degree murder, aggravated robbery, aggravated burglary, and residential burglary following a jury trial. He was sentenced to life imprisonment with a hard 50 mandatory minimum term on the primary offense of murder, plus a consecutive term of 74 months for the other offenses.

## FACTUAL BACKGROUND

On June 9, 2007, Melissa Whitemore encountered Hernandez, an acquaintance of hers, while she was driving around Countryside Estates in Manhattan, Kansas. She stopped to talk to him because she had a couple of bags of his clothing to return to him. Hernandez told Whitemore he had moved back into the trailer home of the eventual victim, Adam Hooks. Together, they took the clothing into Hooks' trailer. Hernandez collected a Sony Play Station and several DVDs, which he said belonged to him. Hernandez then helped Whitemore locate her boyfriend, Anthony Cassell, and all three drove to a pawn shop. Hernandez went in alone to sell the Play Station and DVDs that he had taken from Hooks' trailer. The three of them then went to a hotel room in Junction City.

Meanwhile, Hooks returned to his trailer home at Countryside Estates from his parents' home to find that his trailer had been broken into and items had been taken. Hooks discussed the burglary and theft with several people, including his father, Stan Gettys, a close friend, and a pawn shop owner and reported the incident to the police. Hooks identified his former roommate, Hernandez, as the only person who might have had reason to steal his Sony Play Station and over 100 DVDs.

Near the end of his shift on June 9, 2007, Officer Apodaca of the Riley County Police Department met Hooks to take a report of the burglary and theft. After returning to the office to finish his report, Officer Apodaca looked up and identified Hernandez on the police department's computer.

During this same time, at the hotel room in Junction City, Hernandez and Cassell smoked some marijuana, drank, and possibly used cocaine. When Whitemore and Cassell were ready to go to bed, they asked Hernandez to leave. Hernandez called a friend to pick him up from the hotel. Crystal Coker picked Hernandez up from the hotel in Junction City at the request of the friends she was hanging out with that evening. She dropped Hernandez and the friends off at Countryside Estates around midnight.

Brock Baker-Odell, one of the friends riding with Coker that evening, testified that Hernandez appeared to have been "pretty

well intoxicated," as though "he had been having fun all day," when they picked him up at the hotel. He described Hernandez' speech as unimpaired, although Hernandez "wasn't speaking like a normal person would that would be sober. He wasn't using long words. He was just being brief and talking, but we were still talking and carrying on a conversation." Baker-Odell said that they smoked marijuana on the trip from Junction City to Countryside Estates in Manhattan and, upon arriving at Countryside Estates, they went to a storm shelter and smoked more marijuana before they parted company.

Virgil Koppenhoffer, whose backyard abutted Hooks' backyard in Countryside Estates, testified that Hernandez stopped by in the early morning hours of June 10, 2007, and "drank some beers and left." Koppenhoffer stated that Hernandez was "[n]ot intoxicated, not drunk like I was." In fact, Koppenhoffer testified that he was already intoxicated when Hernandez arrived such that he could not remember the time, and he passed out after Hernandez left.

When Officer Apodaca began his patrol the next morning, June 10, 2007, he saw Hernandez driving Hooks' vehicle near Countryside Estates. The officer followed, but ultimately lost sight of the vehicle. He decided to return to Hooks' residence to see if Hooks could explain this unusual occurrence. When Officer Apodaca arrived at Hooks' trailer home, the vehicle was parked in the driveway. He could see Hernandez walking away from the trailer, taking off a red shirt and exchanging it for a blue shirt. The officer followed Hernandez on foot, but again lost sight of him.

Officer Apodaca returned to the trailer home to attempt to make contact with Hooks. The officer knocked on the door and attempted numerous times to call Hooks' cell phone. On one occasion, the cell phone was answered by a male who identified himself as "Ryan" and told the officer that he had the wrong number. Officer Apodaca called Hooks' father, Stan Gettys, to see if anyone else might answer Hooks' cell phone and if he knew a person named Ryan.

At Officer Apodaca's request, Gettys arrived at the trailer home. Gettys eventually forced open the window to a bedroom, where Officer Apodaca was able to enter and search the home for Hooks.

Other officers, as well as Gettys, walked through the trailer looking for Hooks, but Hooks was not in the residence.

After the backup officers left, Officer Apodaca obtained permission from Gettys to look in Hooks' vehicle. The officer saw several white trash bags with miscellaneous paperwork and clothing in them leaning against the door. In the back of the vehicle, Officer Apodaca opened a Rubbermaid container that was among more bags of what appeared to be laundry. Gettys identified the jeans in the top layer of the container as Hooks' jeans by the belt still through the loops of the jeans. Underneath the jeans, Officer Apodaca found what appeared to be human remains. Hooks' body, in seven parts, was ultimately recovered from the Rubbermaid container, four individual trash bags, and two trash bags wrapped in blankets located in the vehicle.

Police located Hernandez and arrested him at a movie theater, where Hernandez had been watching the movie Hostel 2. After being transported to the Riley County Law Enforcement Center, Hernandez was interviewed and recorded on a videotape in which he provided a fairly detailed description of the events of June 9 and 10. Hernandez said that he knew basically where he went that night, but he was "really messed up." He admitted that after leaving Koppenhoffer's residence, he went to Hooks' trailer to see if he could stay there for the night. Hernandez was unable to remember the details of the conversation, but he knew they had argued.

Hernandez explained that he felt like he was outside his body, watching what happened. Hernandez described finding a hammer on the floor, chasing Hooks into the bedroom, and hitting Hooks, "just [going] off on him," with the hammer. Hernandez was so disturbed by the sight of blood gushing out of Hooks' head and the sound of Hooks' labored breathing that he ran into the living room, sat on the couch, and chain-smoked a pack of cigarettes. Hernandez said that he considered killing himself, because he did not think he was capable of something like that. Feeling bad about what had happened, he decided to hide the body.

Hernandez returned to the bedroom, turned on the light, and observed that "it was bad." Hooks was still gasping for air. Her-

nandez first said that Hooks "just died" while he tried to figure out what to do, but he eventually admitted that he stabbed Hooks twice in the chest. He described two different knives, one that he used to stab Hooks in the heart and another that he used to cut up the body after razor blades did not work. Hernandez described dismembering the body and putting it into plastic bags. He remembered that it was difficult to cut the body into pieces. He wrapped the torso in blood-soaked blankets from the bed and then used towels to clean up the scene. He put the bedding and towels in the vehicle to dispose of with the body and flipped the mattress over to hide the bloodstains. He remembered taking several trips out to the vehicle.

At trial, the jury found Hernandez guilty of premeditated first-degree murder, aggravated robbery, aggravated burglary, and residential burglary. He was sentenced to life imprisonment with a hard 50 mandatory minimum prison term on the primary offense of murder, plus a consecutive term of 74 months for the other offenses.

## Analysis

*Prosecutor's Closing Argument*

Hernandez argues that a comment during closing argument constituted misconduct and denied him a fair trial. The disputed comment was made when the prosecutor began the rebuttal portion of his closing argument: "Since June 10th of 2007, when I watched Adam Hooks' body being removed from a vehicle . . . ." An objection made at trial was directed at another part of the closing argument, but the State concedes that a timely objection is not required to preserve an issue of prosecutorial misconduct that occurs during closing argument. See *State v. Morningstar*, 289 Kan. 488, Syl. ¶ 5, 213 P.3d 1045 (2009).

Hernandez contends that this was a statement of fact not in evidence because no evidence had been presented that the prosecutor actually watched Hooks' body being removed from the vehicle. Further, Hernandez argues that this statement improperly bolstered the State's case by painting the prosecutor "as an insider

who had personal knowledge of the case, and therefore the authority to dismiss doubts."

The standard of review is well established:

"We employ a two-step analysis in considering claims of prosecutorial misconduct. First, the court must determine whether the prosecutor's statements were outside the wide latitude for language and manner a prosecutor is allowed when discussing the evidence. If the first step of the analysis has been met, we consider whether the comments constitute plain error, that is, whether the statements were so gross and flagrant as to prejudice the jury against the accused and deny him or her a fair trial."

"In determining whether a new trial should be granted because of prosecutorial misconduct under the second step in our analysis, we consider: (1) whether the misconduct is so gross and flagrant as to deny the accused a fair trial; (2) whether the remarks show ill will on the prosecutor's part; and (3) whether the evidence against the defendant is of such a direct and overwhelming nature that the misconduct would likely have little weight in the minds of the jurors. None of these three factors is individually controlling, and before the third factor can ever override the first two factors, an appellate court must be able to say both the K.S.A. 60261 and the *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), harmlessness tests have been met." *State v. Scott*, 286 Kan. 54, Syl. ¶¶ 17-18, 183 P.3d 801 (2008).

Our decision in *State v. Ward*, No. 99,549, this day decided, synthesized and clarified our case law on the definition and application of the harmless error standard, including the two standards we have relied upon in the second step of our analysis of prosecutorial misconduct claims, concluding:

"[B]efore a Kansas court can declare an error harmless it must determine the error did not affect a party's substantial rights, meaning it will not or did not affect the trial's outcome. The degree of certainty by which the court must be persuaded that the error did not affect the outcome of the trial will vary depending on whether the error implicates a right guaranteed by the United States Constitution. If it does, a Kansas court must be persuaded beyond a reasonable doubt that there was no impact on the trial's outcome, *i.e.*, there is no reasonable possibility that the error contributed to the verdict. If a right guaranteed by the United States Constitution is not implicated, a Kansas court must be persuaded that there is no reasonable probability that the error will or did affect the outcome of the trial." *State v. Ward*, No. 99,549.

Like Ward, Hernandez claims a violation of rights guaranteed by the United States Constitution, specifically, a violation of his right to a fair trial and a violation of his Fourteenth Amendment

right to due process. As such, we need not address the questions left open by *Ward* regarding the standard that applies to errors which do not implicate the federal constitution. In this case, it is the State's burden, as the party favored by the error, to prove beyond a reasonable doubt that the error did not affect Hernandez' substantial rights, meaning it did not contribute to the verdict obtained. See *State v. Ward*, No. 99,549.

A comment on a matter outside the evidence is improper. *Scott*, 286 Kan. at 84. In *Scott*, the disputed statement was that the prosecutor had listened to the 3-hour confession tape for 60 hours and knew it by heart. Scott argued that the statement was improper because (1) it was a statement outside the evidence, and (2) the statement was designed to make the jury believe the prosecutor's recollection of the tape was especially accurate. After noting that Scott did not argue that the prosecutor's subsequent characterization of his confession was false or misleading, we concluded that the comment was nothing more than a "harmless retrospection." 286 Kan. at 84. Similarly, in this case, the prosecutor's comment was a harmless retrospection on how this case began.

At oral argument, the prosecutor candidly acknowledged that his statement during rebuttal was a comment on a matter outside the evidence. We agree that the statement should have been more artfully phrased to avoid reference to the prosecutor's involvement in the investigation of this case and that this statement was in error. However, we are satisfied by the State's explanation of the statement and persuaded beyond a reasonable doubt that this statement was little more than harmless retrospection that did not contribute to the verdict obtained.

Further, Hernandez does not argue that the statement shows ill will on the part of the prosecutor. Direct physical evidence put Hernandez in close proximity to Hooks at the time of death. Additional testimony showed Hernandez was attempting to dispose of the body and all evidence of the murder when Officer Apodaca interrupted. Combining the physical evidence and the testimony presented at trial with Hernandez' confession, which did not implicate a third person, the evidence in this case was overwhelming

and sufficient such that the jury was not likely influenced by the prosecutor's statement.

*Voluntary Intoxication Instruction*

Hernandez objected to the lack of a voluntary intoxication instruction. The State did not oppose such an instruction. In denying the request, the trial court relied on *State v. Brown*, 258 Kan. 374, 904 P.2d 985 (1995), for the proposition that evidence that the defendant consumed alcohol and drugs on the night of the offense was not enough to support an instruction on voluntary intoxication unless there was evidence that the defendant's consumption of those substances impaired his mental faculties so as to render him unable to form the requisite intent. The trial court went on to say that, as in *Brown*, the "evidence showed the defendant's mental abilities were intact and the defendant's ability to recall in detail the events occurring on the night of the offense. The defendant gave a statement in this case within a number of hours after the events must have occurred and gave a fairly explicit description of what happened. That is a detailed recollection of the events occurring the night of the offense."

Hernandez points to one witness who said that while Hernandez' speech was not impaired by his intoxication, Hernandez' vocabulary was limited and he was unable to use big words. At oral argument, Hernandez reiterated his position that any evidence of consumption of alcohol and/or marijuana is sufficient to require a voluntary intoxication instruction. In this instance, counsel argued that the jury could infer from evidence of consumption alone that Hernandez was intoxicated to the extent that his ability to form the requisite intent was impaired.

The State concedes that there was evidence that Hernandez had gotten high, had consumed alcohol, and had used marijuana and possibly cocaine on June 9, 2007, but maintains that there was no evidence that Hernandez was intoxicated at the time of the murder. The State focuses on Hernandez' confession, in which he stated that he apologized to Hooks before stabbing him twice in the heart so that Hooks would not suffer. Further, shortly after the stabbing, Hernandez admitted to dismembering the body, wrapping it in

plastic bags, and moving it to the vehicle with the ultimate plan of disposing of the body in the river. Finally, Hernandez used latex gloves while dismembering the body, carefully collected blood-stained items at the scene to dispose of with the body, and attempted to clean up himself and the crime scene before leaving. These actions, the State argues, are not the actions of a person who is so intoxicated that he is unable to form the specific intent required for murder.

" 'A defendant is entitled to instructions on the law applicable to his or her theory of defense if there is evidence to support the theory. However, there must be evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with the defendant's theory.' " *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008).

Voluntary intoxication may be a defense to any crime that requires specific intent. *Brown*, 258 Kan. at 386. Hernandez was charged with premeditated first-degree murder, aggravated burglary, and burglary, all of which require specific intent. K.S.A. 21-3401; K.S.A. 21-3716; K.S.A. 21-3715. This question hinges on whether the evidence, viewed in the light most favorable to Hernandez, shows that Hernandez was intoxicated to the extent that his ability to form the requisite intent was impaired. See, *e.g., Brown*, 258 Kan. at 386-87 ("Although there was evidence, presented by both the State and the defense, that the defendant had consumed alcohol and drugs on the night of the offense, the record is devoid of evidence that the defendant's consumption of those substances impaired his mental faculties so as to render him unable to form the requisite intent. There was no evidence that the defendant's physical or mental abilities were impaired. In fact, the evidence demonstrates the defendant's mental abilities were clearly intact in that he was able to recall in detail the events which occurred the night of the offense."); *State v. Johnson*, 258 Kan. 475, 486, 905 P.2d 94 (1995) ("Although there was evidence, presented by both the State and the defense, that the defendant had consumed alcohol, and even by one witness that he was 'drunk,' the record is devoid of evidence that the defendant's consumption of alcohol impaired his mental faculties so as to render him unable to form the requisite intent. The defendant was able to recall his

activities on the night of the offense. [Citations omitted.] An instruction on voluntary intoxication was not required.").

Although there was evidence in this case that Hernandez had consumed alcohol and marijuana on the night of the murder, there was not evidence which, viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding that Hernandez was so intoxicated that he was unable to form the specific intent necessary for the crimes charged. Witnesses described Hernandez as "high" or "intoxicated," but all believed that Hernandez was aware of what was going on and what he was doing. Perhaps more importantly, Hernandez provided a detailed recollection of the events on the night of the offense, which demonstrates that Hernandez' mental faculties were intact. The trial court used the appropriate standard to determine whether a voluntary intoxication instruction was appropriate. A defendant must present evidence that his or her consumption of alcohol or drugs impaired his or her mental faculties so as to render him or her unable to form the requisite intent. *State v. Parker*, 22 Kan. App. 2d 206, 209, 913 P.2d 1236 (1996). This court will not infer impairment based on evidence of consumption alone. Accordingly, the trial court did not err in finding that there was insufficient evidence to find that Hernandez' mental faculties were so impaired as to render him unable to form the requisite intent.

*Identical Offense Doctrine*

Hernandez argues that the premeditation required for premeditated first-degree murder is no different from the intentional killing required for intentional second-degree murder. Further, Hernandez argues that the instructions defining "premeditation" and "intentional" imply that acting on purpose, with knowledge of one's actions, satisfies both elements. This court rejected this argument in *State v. Warledo*, 286 Kan. 927, 951, 190 P.3d 937 (2008).

"It is well established that offenses are identical when they have the same elements. [Citations omitted.] In order to determine whether the elements are identical for sentencing purposes, an appellate court must consider the statutory elements and that review is unlimited." *Warledo*, 286 Kan. at 951. In *Warledo*, this

court considered the argument that premeditated first-degree murder and intentional second-degree murder run afoul of the identical offense sentencing doctrine because there is no appreciable difference between "premeditation" and "intentional." This court concluded that the two "crimes are clearly not identical." *Warledo*, 286 Kan. at 951. Hernandez has not presented any new arguments or rationale that persuades us to change our analysis of this issue.

*Hard 50 Sentencing Scheme*

Hernandez argues that the hard 50 sentencing scheme is unconstitutional because a jury does not find the facts that increase the term of parole ineligibility beyond a reasonable doubt. This court has repeatedly upheld the hard 50 sentencing scheme against constitutional challenges of this nature. See, *e.g.*, *State v. Ellmaker*, 289 Kan. 1132, Syl. ¶ 11, 221 P.3d 1105 (2009); *State v. Horn*, 278 Kan. 24, 44, 91 P.3d 517 (2004); *State v. Washington*, 275 Kan. 644, 680, 68 P.3d 134 (2003). Again, we see no new arguments that persuade us to alter our analysis.

*Sentence to the Highest Term in a Presumptive Grid Block*

Hernandez argues that it was error for the trial court to sentence him to the high or aggravated sentence in the grid box for aggravated robbery, aggravated burglary, and burglary without a finding of the aggravating factors made by a jury. "Under K.S.A. 21-4721(c)(1), an appellate court is without jurisdiction to consider a challenge to a presumptive sentence, even if that sentence is to the highest term in a presumptive grid block." *State v. Johnson*, 286 Kan. 824, Syl. ¶ 6, 190 P.3d 207 (2008). As we noted in *Johnson*, we have consistently found that a sentence that falls within the grid box is constitutional and may be considered a presumptive sentence; therefore, the appellate courts lack jurisdiction to consider such sentences. *Johnson*, 286 Kan. at 842.

*BIDS Fee*

Hernandez claims that although the trial court considered his ability to pay, the trial court's assessment of Board of Indigents' Defense Services (BIDS) attorney fees defies logic and is uncon-

stitutional because the court acknowledged that the fees may never be paid in full. The trial court made the following findings:

"The Court will direct that the restitution and the reimbursement to BIDS be paid in that order. Restitution first and then other matters following—other financial matters following over the period of sentence. I recognize that Mr. Hernandez is not going to be in a position to gain outside employment. On whatever limited basis that he is able to engage in the remunerative employment during his incarceration that that should go toward these items. The Court will direct that reimbursement to BIDS be made for fees. Again, I understand that that may never get paid in full, but there is a long period of time that is involved and to the extent that money can be paid toward it that it can and should be done because it enables others to be represented as well. I don't want to diminish in any respect the efforts—substantial efforts made by counsel for the defendant on his behalf by implying through the Court's order that he has not received anything other than the best benefit of counsel throughout this case."

The assessment of attorney fees involves the interpretation of a statute, which is a question of law over which an appellate court exercises unlimited review. *State v. Robinson*, 281 Kan. 538, 539, 132 P.3d 934 (2006). This court has interpreted the statute at issue here to

" 'clearly require[] a sentencing judge, "in determining the amount and method of payment" of BIDS reimbursement, *i.e.*, at the time the reimbursement is ordered, to "take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose." The language is mandatory; the legislature stated unequivocally that this "shall" occur.' " *State v. Drayton*, 285 Kan. 689, 715-16, 175 P.3d 861 (2008) (quoting *Robinson*, 281 Kan. at 543).

This court uses an abuse of discretion standard to review the amount of the fee imposed. *Drayton*, 285 Kan. at 716. In *Drayton*, this court reversed the assessment of attorney fees for reimbursement of BIDS fees because the district court found Drayton was essentially unable to afford to reimburse any of the $7,110 fee imposed because he would be imprisoned for the next 25 years. *Drayton*, 285 Kan. at 716. In this case, the trial court made a finding that Hernandez would have some ability to pay the BIDS fees due to the possibility of remunerative employment during his lengthy incarceration period. The fee imposed here was not an abuse of discretion.

Affirmed.