NOT DESIGNATED FOR PUBLICATION

No. 125,918

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

CHARLES MELVIN WILSON II,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; DAVID B. DEBENHAM, judge. Oral argument held on May 21, 2024. Opinion filed July 5, 2024. Affirmed.

*Michelle A. Davis*, of Kansas Appellate Defender Office, for appellant.

*Carolyn A. Smith*, assistant district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before BRUNS, P.J., HILL, J., and MARY E. CHRISTOPHER, S.J.

PER CURIAM: Charles Melvin Wilson II appeals after a jury convicted him of second-degree intentional murder, aggravated assault, and aggravated endangering a child. On appeal, Wilson raises several jury instruction issues and challenges the sufficiency of the evidence presented at trial regarding his aggravated endangerment of a child conviction. Wilson also challenges the restitution payment plan ordered by the district court at the sentencing hearing. Finally, Wilson argues cumulative error. Based on our review of the record on appeal, we find no reversible error. Thus, we affirm Wilson's convictions and his sentence.

1

It is undisputed that on May 7, 2020, Wilson shot and killed Lisa Hill at the home of Kristen Massey. He then went outside and pointed a gun at a father and his four minor children who lived next door to Massey's house. After leaving the scene of the shooting, Wilson went home and got on Facebook live where he not only admitted to killing Hill but also said that "it felt good to shoot" her. He added that he was "not sorry that [he] killed [her]."

*The Shooting*

On the afternoon of the shooting, Massey brought Wilson to her home so he could talk to Hill about his potential involvement in the death of Hill's son two weeks before. When Massey picked Wilson up at his house that day, she noticed that he had a handgun. She asked Wilson to leave the gun inside her car while he was inside her house. Unfortunately, Wilson did not comply with her request.

During the time Wilson and Massey were at her house, Derek Meek, Alexander Thomas, Reuben Wagner, Jerrod (Jerry) Bond, and Jacob Rose were also there. Hill was sitting at a table in the kitchen and Wilson went in to talk to her. Massey—who remained in the kitchen—testified at trial that both Hill and Wilson remained calm during their conversation. After talking for about 30 minutes, Wilson lit what has been described as a "wet" cigarette. Meek later told police that it was a "formaldehyde cigarette."

Around the same time, Massey went into her bedroom. While she was there, she heard Wilson begin arguing with Bond about a set of speakers. Bond would testify at trial that Wilson pointed a gun at him during this argument. Likewise, Massey testified that when she left her bedroom, she saw Wilson pointing a gun at Bond. In addition, Massey testified that she heard Hill tell Wilson to put the gun away and go home.

As Massey was walking back to her bedroom, she heard a gunshot. A few seconds later, Massey heard the second gunshot. At trial, Bond, Rose, and Thomas also testified that they heard two gunshots. And Meek testified at the preliminary hearing that he saw Wilson shoot Hill twice.

Just after the shooting, Wilson ran out the front door of Massey's house with the gun still in his hand. At this time, Massey's next-door neighbor was returning home with his four children ranging in age from 1 to 13 years old. The neighbor would testify at trial that he was getting two of his children out of his vehicle when he heard several loud noises. He explained that his 13-year-old child was on the front porch of the house with his youngest child at this time.

As the neighbor walked toward the front porch with his 4- and 8-year-old children, he saw Wilson running out of Massey's house holding a gun. He testified that Wilson pointed the gun at him, at his 4-year-old child, and at his 8-year-old child. The neighbor explained that Wilson pointed the gun at him and his two kids "[l]ong enough for me to say about four sentences to him." He recalled telling Wilson that he had nothing to do with the house next door and that he was taking his kids inside. He also recalled asking Wilson to stop pointing the gun at them. Although Wilson did not orally respond, he lowered the gun and started walking down the sidewalk.

A 911 dispatcher received a call from Thomas at 3:47 p.m., in which he reported that Wilson had shot Hill and was not sure if she was breathing. First responders were sent to Masseys house and Detective Jason Judd—who would serve as the lead investigator in the case—went with several other officers from the Topeka Police Department to Wilson's house. According to Detective Judd's trial testimony, he and the other officers arrived at Wilson's house around 4 p.m.

3

Upon arriving at Wilson's house, Detective Judd told Wilson that he needed to come out to talk to the officers. At that point, Wilson refused to come out of his house. Accordingly, a Topeka Police Department tactical team arrived and set up a barricade operation around Wilson's house. As they did so, Detective Judd traveled to the scene of the shooting.

Detective Judd testified at trial that it was determined that Hill had been shot two times. He also testified that the physical evidence at the scene showed that Hill was shot once from a few feet away and that the shooter then moved closer to her before firing the second shot. After leaving the crime scene at Massey's home, Detective Judd returned to the Law Enforcement Center.

*The Facebook Live Broadcast*

While he was at the Law Enforcement Center, Detective Judd learned that Wilson was streaming a live video on Facebook from inside his home. The detective was able to pull up and watch the Facebook live video. During the broadcast, Wilson admitted several times to shooting and killing Hill. At one point he said, "Lisa, I'm sorry I killed you" but a few seconds later he stated, "No, I'm really not sorry I killed you." He also stated that "it felt good to shoot that bitch" and claimed to have been "out of my mind high" at the time he shot Hill.

Wilson livestreamed on Facebook for about two hours. During this time, he spoke about a number of things in addition to admitting to killing Hill. At some point, Wilson spoke with officers and stated that he wanted Detective Judd to come and handcuff him. The livestream broadcast finally ended at 6:19 p.m. Wilson then exited his house and was arrested by the tactical team before Detective Judd returned to Wilson's house. Detective Judd later obtained a search warrant for the Facebook live video and it was admitted into evidence at trial.

*The Police Interview*

Upon being brought to the Law Enforcement Center, Wilson was placed in an interview room. Before being interviewed, Wilson was allowed to step outside with Detective Judd to smoke a cigarette. During their conversation—which was recorded by the detective—Wilson again admitted to killing Hill. Around 8:00 p.m., Detective Judd began his formal interview of Wilson.

During the interview, Wilson once again admitted to killing Hill. At one point, he stated that he shot Hill because she had treated her son—who himself had recently been killed—inappropriately when he was three-years old. Wilson said that he was on PCP when he shot Hill. He also indicated that he did not know why he pointed the gun at Bond because they were friends. Although he explained to Detective Judd that he did not know what Hill did during his argument with Bond that made him shoot her, Wilson said he would not lose any sleep over killing Hill.

When discussing the shooting, Wilson thought he had only shot Hill once. He explained that his gun had jammed, and that he needed to unjam it to shoot Hill. At the end of the interview, Wilson yet again stated that he had no regrets about killing Hill. He added that not only did he not care that she was dead, but also that he would kill her again if he had the opportunity to do so.

*The Criminal Case*

The State ultimately charged Wilson with first-degree premeditated murder in violation of K.S.A. 2019 Supp. 21-5402(a)(1). In addition, the State charged Wilson with one count of aggravated assault with a deadly weapon in violation of K.S.A. 2019 Supp. 21-5412(b)(1), and one count of aggravated endangering a child in violation of K.S.A. 2019 Supp. 21-5601(b)(1). Before trial, Wilson filed proposed jury instructions in which

he requested that the district court give an instruction on voluntary intoxication. Likewise, Wilson requested that the district court instruct the jury on the lesser included offenses of second-degree murder, voluntary manslaughter, and involuntary manslaughter.

On March 21, 2022, the district court began a four-day jury trial. The State presented the testimony of 15 witnesses and introduced 66 exhibits that were admitted into evidence. The State's evidence included various photos taken by law enforcement officers at the crime scene. The State's evidence also included Wilson's Facebook live video, the audio recording of his conversation with Detective Judd during the smoke break on the night of the shooting, and the video recording of Detective Judd's formal interview of Wilson. Additionally, the State admitted a recorded phone conversation between Wilson and someone he called "Pops" shortly after the formal interview had concluded. During this phone call, Wilson admitted killing Hill and stated once more that he would do it again.

After the State rested, Wilson recalled Officer Jared Rowley and Detective Judd as witnesses. During Detective Judd's testimony, he also offered 12 exhibits that were admitted into evidence. Wilson's exhibits constituted photographs of the interior of Massey's home taken by law enforcement officers during the investigation. At no point during the trial did Wilson's counsel dispute that his client had shot and killed Hill. Rather, defense counsel argued that the killing was not premeditated.

At the close of the evidence, the district court conducted a jury instruction conference. The district court granted Wilson's request for an instruction on the lesser included offense of second-degree murder. However, the district court denied Wilson's request for a voluntary intoxication instruction. In denying this requested instruction, the district court found that even though there was some evidence presented regarding

6

Wilson's drug use shortly before the shooting, there was no evidence that he was so intoxicated as to make him incapable of forming the requisite intent to kill.

The district court also denied Wilson's request for a voluntary manslaughter instruction. It explained that the evidence did not rise to the level of "a sudden quarrel done in the heat of passion." Finally, the district court denied Wilson's request for an involuntary manslaughter instruction. In doing so, the district court found that the evidence did not support an instruction for involuntary manslaughter based on recklessness.

After deliberation, the jury found Wilson to be guilty of intentional second-degree murder in the killing of Hill, aggravated assault with a deadly weapon, and aggravated endangering a child. After receiving the jury's verdict, the district court revoked Wilson's bond, ordered a presentence investigation report be completed, and scheduled the case for sentencing.

*The Sentencing*

On May 26, 2022, the district court conducted a sentencing hearing. Based on Wilson's criminal history score of C, the district court sentenced Wilson to an aggravated sentence of 285 months in prison with 36 months of postrelease supervision for his intentional second-degree murder conviction. For the aggravated assault conviction, the district court imposed a consecutive 12-month prison sentence with 12 months of postrelease supervision. For the aggravated endangering a child conviction, the district court imposed a consecutive 6-month prison sentence with 12 months of postrelease supervision. Accordingly, the district court imposed a total prison sentence of 303 months.

The district court also imposed $202.50 in court costs, $200 for a DNA database fee, $400 for a KBI lab fee, $100 for a BIDS application fee, and $5,000 in restitution to be paid to the Crime Victims Compensation Board. The district court then considered the recommendations of the parties regarding a workable payment plan. After doing so, the district court adopted defense counsel's suggestion for monthly payments in the amount of $20 until paid in full.

Thereafter, Wilson filed a timely notice of appeal.

ANALYSIS

*Voluntary Intoxication Instruction*

The first issue presented by Wilson on appeal is whether the district court erred in denying his request for a voluntary intoxication instruction. In response, the State candidly concedes that such an instruction would have been legally appropriate. Even so, it contends that a voluntary intoxication instruction was not factually appropriate because there was no evidence presented at trial to establish that Wilson was so intoxicated that he could not form the requisite intent to commit the crime of intentional second-degree murder. In the alternative, the State argues that any error by the district court in failing to give the requested instruction was harmless.

In evaluating jury instruction issues, we follow a three-step process: (1) We determine whether there is appellate jurisdiction; (2) we consider the merits of the claim to determine whether an error occurred in the district court; and (3) we assess whether the alleged error was harmless. *State v. Holley*, 313 Kan. 249, 253, 485 P.3d 614 (2021). At the second step, we consider whether the instruction in dispute was legally and factually appropriate. In determining whether an instruction was factually appropriate, we must

8

determine whether there was sufficient evidence—viewed in a light most favorable to the defendant—that would support the giving of the instruction to the jury. 313 Kan. at 255.

Here, there is no dispute about our jurisdiction to review this issue. Likewise, it is undisputed that Wilson requested a voluntary intoxication jury instruction, and the district court denied his request. Further, as indicated above, the State has conceded that the giving of a voluntary intoxication instruction would have been legally appropriate. Thus, we turn to the question of whether the district court erred in finding that a voluntary intoxication instruction was not factually appropriate and, if so, whether the alleged error was harmless.

A review of the record reveals that Wilson requested that the district court give two pattern instructions on voluntary intoxication. We note that he asked that both instructions be included with the elements instruction for first-degree murder—a charge on which he was not convicted—and one of these instructions be included in the requested second-degree murder and voluntary manslaughter instructions. As discussed above, the jury ultimately convicted Wilson of the lesser included offense of intentional second-degree murder.

Specifically, Wilson proposed that the district court give an instruction stating that "[e]vidence of Voluntary Intoxication may be considered in determining whether such intoxication impaired the defendant's mental faculties to the extent that he was incapable of forming (*the conscious objective to intentionally kill Lisa Hill*)." PIK Crim. 4th 52.060. Wilson proposed including this pattern instruction in the requested intentional second-degree murder instruction. He also proposed that the district court instruct the jury that "[e]vidence of Voluntary Intoxication may be considered in determining whether such intoxication impaired the defendant's mental faculties to the extent that he was incapable of forming (*the design or intent to kill before the act*)." PIK Crim. 4th 52.070. Because

Wilson was not convicted of first-degree premeditated murder, only the first pattern instruction on intentional murder is relevant.

K.S.A. 21-5205(b) states:

"An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

The Kansas Supreme Court has held that a voluntary intoxication instruction may negate the intent element of a specific intent crime. Such crimes include premeditated first-degree murder and intentional second-degree murder. See *State v. Gallegos*, 313 Kan. 262, 271, 485 P.3d 622 (2021); *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020). In the present case, the parties dispute whether a voluntary intoxication instruction was factually appropriate based on the evidence presented at trial. The Kansas Supreme Court has held that "[e]vidence of mere consumption of intoxicants does not necessitate a voluntary intoxication instruction." *Gallegos*, 313 Kan. at 271 (citing *State v. Davis*, 306 Kan. 400, 414-15, 394 P.3d 817 [2017]). Rather, our Supreme Court has consistently interpreted K.S.A. 21-5205(b) to require the evidence to be sufficient to establish proof of impairment to the defendant's "'ability to form the requisite intent.'" 313 Kan. at 271 (quoting *State v. Betancourt*, 299 Kan. 131, 141, 322 P.3d 353 [2014]).

In *State v. Davis*—looking to the case of *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 (2011) for guidance—the Kansas Supreme Court held that "[a] defendant's ability to recall the circumstances surrounding the charged crime and provide a coherent narrative of his or her conduct undercuts a claim of intoxication sufficient to warrant a [voluntary intoxication] jury instruction." *Davis*, 306 Kan. at 414-15. In *Hernandez*, our Supreme Court found that the district court did not commit error when it denied a request for a voluntary intoxication instruction even though there was evidence presented to show

10

that the defendant drank alcohol and smoked marijuana on the night of the murder. The *Hernandez* court found it to be significant that the defendant "provided a detailed recollection of the events on the night of the offense, which demonstrates that [his] mental faculties were intact." 292 Kan. at 607.

More recently, in *State v. Morris*, 311 Kan. 483, 490-91, 463 P.3d 417 (2020), our Supreme Court found that the district court did not err in refusing to give a requested voluntary intoxication instruction in a first-degree murder case. In *Morris*, our Supreme Court found that evidence showing the defendant had smoked methamphetamine on the day of the murder was not sufficient to show that he "was intoxicated to a degree that would impair his ability to form the necessary intent." 311 Kan. at 491. Again, the *Morris* court found it to be significant that the defendant could provide "a coherent narrative" of the events leading to the murder, "including what he did and why he did it." 311 Kan. at 491.

Viewing the evidence in a light most favorable to Wilson, the record contains evidence that he had smoked a "wet" cigarette shortly before he shot and killed Hill. Although there is some evidence in the record to suggest that the cigarette was dipped in formaldehyde, the evidence about what was actually in the cigarette is unclear. Regardless, there is no evidence in the record to show what the effects of smoking a cigarette dipped in formaldehyde might be or how long it would take one to become so intoxicated that he or she could not form the requisite intent to commit murder.

Additionally, Wilson told Detective Judd during his formal interview that he had been on PCP during the shooting. But no evidence was presented at trial to prove when he took PCP, how he took the PCP, or the amount of PCP that he took. Nevertheless, Wilson knew that he had killed Hill soon after the shooting as shown by his Facebook live broadcast. He was also able to explain his alleged justification for killing her during the broadcast.

11

The evidence shows that Wilson started his Facebook live broadcast about 20 minutes after the initial call was made to 911 to report the shooting. Although Wilson ranted about various issues during the broadcast, he admitted several times that he had killed Hill and that he did so by shooting her. He also gave his explanation for shooting her and said that "it felt good to shoot that bitch." Even though he briefly suggested that he felt remorse for killing Hill at one point during the broadcast, he went on to say "actually, I'm not sorry that I killed you."

After he was arrested a few hours after the shooting, Wilson continued to recall that he had killed Hill and again attempted to justify why he did so. In particular, he told Detective Judd that Hill "needed to die" and that shooting her "felt good." Likewise, during his formal interview, Wilson repeated several times that he had killed Hill and described how he had to get his gun "unjammed" so he could shoot her.

The recording of the interview shows that Wilson was able to answer Detective Judd's questions and provide coherent answers about what had occurred. Wilson was able to recount the conversation he had with Hill when he arrived at Massey's house and recalled that he had an argument with Bond about a set of speakers immediately prior to shooting Hill.

The record does contain some evidence to suggest that Wilson could not recall all the details about what had happened at Massey's house on the afternoon of the shooting. Although Wilson provided specific reasons to Detective Judd about why he shot Hill, he stated that he remembered nothing Hill may have done during his argument with Bond to make him want to shoot her. Likewise, Wilson thought he had only shot Hill once while the forensic evidence shows that he shot her twice. Wilson also said that he could not recall the details regarding pointing his gun at Massey's neighbor as he ran from her house following the shooting.

12

Still, Wilson consistently admitted to shooting Hill, staunchly gave his alleged justification for doing so, and repeatedly made it clear that he did not regret killing her during his Facebook live broadcast and during his formal interview conducted by Detective Judd. Additionally, after the formal interview ended, Wilson was allowed to call someone he called "Pops" using Detective Judd's cellphone. During this conversation he yet again admitted to killing Hill, stated that she "deserved to die," and asserted that "it felt good" to kill her.

Under these circumstances, we do not find that the district court erred in finding that there was not a sufficient factual basis for the giving of a voluntary intoxication instruction. Viewing the evidence in the light most favorable to Wilson, the record does not contain sufficient evidence to establish proof of impairment to the extent that he did not have the "ability to form the requisite intent" to commit second-degree murder. See *Betancourt*, 299 Kan. at 141-42. Although one could reasonably infer from the evidence that Wilson was intoxicated when he shot Hill, the fact that he smoked a "wet" cigarette—which may have changed his demeanor—is not sufficient to establish that he was incapable of forming the requisite intent to intentionally commit Hill's murder.

Even if Wilson had shown that the district court's failure to give a voluntary intoxication instruction was erroneous, we find the alleged error to be harmless based on our review of the record on appeal. Because failing to give a voluntary intoxication instruction arguably impacted Wilson's theory of defense, we apply a constitutional harmless error test. See *State v. Andrew*, 301 Kan. 36, 46-47, 340 P.3d 476 (2014). Under the constitutional harmless error test, the State must show in light of the entire record that there was no reasonable possibility that the alleged error contributed to the jury's verdict. See *Holley*, 313 Kan. at 256-57.

As addressed above, K.S.A. 21-5205(b) provides that "[a]n act committed while in a state of voluntary intoxication is not less criminal" because the person committing the

crime was under the influence of drugs or alcohol. Instead, the plain and unambiguous language of the statute goes to determining whether a person had the "intent" or "state of mind" to commit a particular crime. Here, the jury—after carefully considering the evidence—chose not to convict Wilson of the premediated first-degree murder of Hill. Instead, the jury determined that Wilson was guilty of the lesser included offense of intentional second-degree murder.

To convict Wilson of intentional second-degree murder, the State was required to prove beyond a reasonable doubt that he killed a person intentionally. K.S.A. 21-5403(a)(1). A review of the record on appeal reveals that the jury heard a vast amount of evidence to establish that Wilson intentionally shot Hill at Massey's house. The jury also heard a substantial amount of evidence about Wilson consuming alcohol and drugs that day as well as regarding his alleged intoxication. The jury also heard the defense counsel's argument that Wilson was high when he shot Hill and that he did not intend to kill her.

After carefully considering the evidence, the jury found that the State had not proven premeditation on the part of Wilson but that it had proven intent beyond a reasonable doubt. In light of the overwhelming evidence presented at trial—including Wilson's repeated admissions that he had killed Hill and explanations of his alleged justification for doing so—we find that the State has established that there is no reasonable possibility that the alleged instructional error contributed to the jury's verdict. Accordingly, we conclude that the district court did not err in declining to give a voluntary intoxication instruction to the jury and that under the circumstances presented the alleged error would be harmless in light of the evidence and our review of the entire record.

14

*Voluntary Manslaughter Instruction*

Next, Wilson contends that the district court erred by failing to instruct the jury on voluntary manslaughter. He argues that there was sufficient evidence presented at trial to show that he killed Hill in the heat of passion. In response, the State contends that the district court appropriately found that a voluntary manslaughter instruction was not factually appropriate under the circumstances presented. Our standard of review for this issue is the same as in the first issue.

The Kansas Supreme Court has recognized that voluntary manslaughter—a knowing killing committed upon a sudden quarrel or in the heat of passion—is a lesser included offense of premeditated first-degree murder. *State v. Brownlee*, 302 Kan. 491, 512, 354 P.3d 525 (2015); K.S.A. 21-5404(a). Because Wilson was charged with premeditated first-degree murder, the parties agree that a voluntary manslaughter instruction was legally appropriate. Even so, the parties disagree on whether a voluntary manslaughter instruction was factually appropriate.

The district court must instruct the jury on lesser included offenses where the evidence—viewed in a light most favorable to the defendant—would reasonably justify a conviction of the lesser included offense. K.S.A. 22-3414(3); see also *State v. Haygood*, 308 Kan. 1387, 1408, 430 P.3d 11 (2018). In other words, a district court should instruct on an alleged lesser included offense "only when there is sufficient supporting evidence from which a rational factfinder could find that the events occurred consistent with the defendant's theory." *State v. Rutter*, 252 Kan. 739, Syl. ¶ 2, 850 P.2d 899 (1993). Here, we agree with the district court that a voluntary manslaughter instruction was not factually appropriate based on the evidence presented at trial.

Voluntary manslaughter is an intentional killing based on a legally sufficient provocation. The Kansas Supreme Court has defined the statutory language "heat of

passion" as used in K.S.A. 21-5404(a) to mean "'any intense or vehement emotional excitement of the kind prompting violent and aggressive action, such as rage, anger, hatred, furious resentment, fright, or terror,' based 'on impulse without reflection.'" *State v. Hayes*, 299 Kan. 861, 864, 327 P.3d 414 (2014) (quoting *State v. Guebara*, 236 Kan. 791, 796, 696 P.2d 381 [1985]). A legally sufficient provocation is one that would cause an ordinary person to lose control of his or her actions and reason. See *State v. Gallegos*, 286 Kan. 869, 875, 190 P.3d 226 (2008).

In *State v. Brownlee*, the Kansas Supreme Court explained that a "sudden quarrel" between the killer and the victim could be sufficient "provocation" under K.S.A. 21-5404(a). 302 Kan. at 513-14. Significantly, our Supreme Court has also held that a sudden quarrel between the killer and a third-party cannot by itself support the giving of a voluntary manslaughter instruction. See *State v. Clark*, 263 Kan. 370, 374, 949 P.2d 1099 (1997) (holding that a voluntary manslaughter instruction was inappropriate when a defendant shot a victim after fighting with a third-party). Here, there is no evidence in the record to suggest that Wilson and Hill were arguing at the time he shot her.

Viewing the evidence in the light most favorable to Wilson, we find nothing in the record that would have reasonably justified instructing the jury on voluntary manslaughter. Although Wilson and Bond were arguing shortly before or at the time Hill was shot, there is no evidence in the record to establish an argument between Wilson and Hill. Instead, the record reveals that both Wilson and Hill remained calm during their conversation about the death of Hill's son. At most, the record reflects that Wilson and Bond were involved in an argument. As discussed above, a sudden quarrel between the killer and a third-party is not a sufficient justification for instructing the jury on voluntary manslaughter.

Moreover, the evidence shows that Wilson started the argument with Bond over who owned a set of speakers. During this argument, Wilson pulled out his gun and

16

pointed it at Bond who was unarmed. Hill's only involvement was to ask Wilson to put the gun away and go home. Then, as Bond started to run out of Massey's house, Wilson shot Hill. As the district court determined, there is no evidence in the record of provocation by Hill and instructing the jury on voluntary manslaughter was not factually appropriate. Consequently, we conclude that the district court did not err in denying Wilson's request for a voluntary manslaughter instruction.

Even if Wilson could show that the district court's failure to give a voluntary manslaughter instruction was erroneous, such an error would be harmless in light of the entire record. The jury heard the testimony describing the argument between Wilson and Bond. But—as addressed above—the evidence of Wilson's intent to shoot Hill was overwhelming in light of his multiple admissions to killing her and his statements about why he allegedly shot her. So, we conclude that there is no reasonable probability that the lack of a voluntary manslaughter instruction affected the jury's decision to convict Wilson of intentional second-degree murder.

*Aggravated Endangerment of a Child*

Wilson also contends that the State did not present sufficient evidence to prove that he was guilty of felony aggravated endangerment of a child. Rather, he argues that the State only proved that he was guilty of misdemeanor endangerment of a child. In response, the State contends that it presented sufficient evidence at trial to prove beyond a reasonable doubt that Wilson committed each element of felony aggravated endangerment of a child. In support of this contention, the State points out that despite Wilson's suggestion to the contrary, "actual harm" is not an element of the crime.

We review a challenge to the sufficiency of the evidence in a criminal case by viewing the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. In

17

making this determination, we are not to reweigh the evidence, resolve conflicts in the evidence, nor determine the credibility of witnesses. *State v. Aguirre*, 313 Kan. 189, 209, 485 P.3d 576 (2021). "This is a high burden, and only when the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt should we reverse a guilty verdict." *State v. Meggerson*, 312 Kan. 238, 247, 474 P.3d 761 (2020).

Kansas law defines aggravated endangerment of a child as "recklessly causing or permitting a child under the age of 18 years to be placed in a situation in which the child's life, body or health is endangered." K.S.A. 21-5601(b)(1). As outlined in jury instruction No. 16, the State was required to prove the following elements beyond a reasonable doubt to convict Wilson of aggravated endangerment of a child:

> "1.    The defendant recklessly caused or permitted N.R. and/or W.R. to be placed in a situation in which N.R.'s and/or W.R.'s life, body or health was endangered.
> "2.    N.R. and/or W.R. was less than 18 years old.
> "3.    This act occurred on or about the 7th day of May, 2020, in Shawnee County, Kansas," (citing PIK Crim. 4th 56.020).

The district court further instructed the jury that "[a] defendant acts recklessly when the defendant consciously disregards a substantial and unjustifiable risk that certain circumstances exist or a result of the defendant's actions will follow." See PIK Crim. 4th 52.010.

Wilson does not deny that he pointed the gun he had just used to kill Hill at the children who lived next door as he exited Massey's house. Rather, he argues that there was insufficient evidence presented at trial to establish that he harmed or endangered the children when he did so. It appears that Wilson's argument is conflating actual harm with endangerment. While the Kansas Legislature has not defined the term "endangered" as used in K.S.A. 21-5601, our court has found that felony aggravated child endangerment does not require actual harm to endanger a child. Specifically, in *State v. Herndon*, 52

18

Kan. App. 2d 857, 866, 379 P.3d 403 (2016), we held that "the crime is placing a child in a position of peril, not in causing the actual injury that may follow."

Similarly, in *State v. Martinez*, No. 108,441, 2014 WL 3731888, at *7 (Kan. App. 2014) (unpublished opinion), the defendant argued—as Wilson is doing in this case—that the State did not present sufficient evidence at trial to convict him of aggravated endangering a child because there was no evidence presented at trial to show that a child was actually harmed by his actions. In affirming the defendant's felony conviction, this court found that the evidence showing that he pointed a loaded gun at a child during a robbery was sufficient to establish aggravated endangering a child. As the *Martinez* panel found, "[p]ointing a loaded gun at an individual immediately places that individual in danger." 2014 WL 3731888, at *7-8. We agree.

Viewing the evidence in the light most favorable to the State, a rational fact-finder could have found Wilson guilty of aggravated endangering a child beyond a reasonable doubt. The evidence shows that immediately after shooting Hill, Wilson ran out of Massey's house exiting through the front door. At the same time, Massey's next-door neighbor was returning home with his four minor children. The neighbor testified that Wilson pointed the gun at him and at two of his children. One can reasonably infer from the evidence that Wilson's gun was loaded when he pointed it at the children because he had just used it to shoot Hill twice.

Viewing the evidence in the light most favorable to the State, we find that the record establishes that Wilson recklessly pointed a loaded gun at the children and by doing so, endangered them. Based on this evidence, we conclude that a rational juror could have found beyond a reasonable doubt that Wilson was guilty of felony aggravated endangering a child.

*Misdemeanor Endangerment of a Child*

For the first time on appeal, Wilson contends that the district court also erred by failing to give an unrequested jury instruction on the lesser included offense of misdemeanor endangerment of a child. In support of this contention, Wilson rehashes much of his argument about the sufficiency of evidence to support his felony aggravated endangering a child conviction. The State responds by contending that the district court did not error by failing to give a misdemeanor endangerment of a child instruction. The State further argues that even if the giving of the instruction was legally and factually appropriate, Wilson has failed to show clear error.

It is undisputed that Wilson did not request an instruction on the lesser included offense of misdemeanor endangerment of a child at trial. When an instructional issue is raised for the first time on appeal, this court determines whether failing to give the instruction was clearly erroneous. K.S.A. 22-3414(3); see also *State v. Williams*, 295 Kan. 506, 510, 286 P.3d 195 (2012). To determine whether it was clearly erroneous to fail to give an instruction, we first determine whether the instruction was legally and factually appropriate. If so, we then move on to determine whether the party asserting error has established that failing to give the instruction was clearly erroneous. *Williams*, 295 Kan. at 521.

The parties agree that endangerment of a child—which is a misdemeanor—is a lesser degree of aggravated endangering a child—which is a felony. See K.S.A. 21-5601. As a result, the parties agree that it would have been legally appropriate for the district court to instruct the jury on the lesser included offense of misdemeanor endangering a child. Likewise, the parties agree that the giving of such an instruction would have been factually appropriate based on the evidence presented at trial.

Accordingly, we move on to the question of whether the district court's failure to give a misdemeanor endangerment of a child instruction constituted clear error. See *Williams*, 295 Kan. at 523. The Kansas Supreme Court has held that an "[i]nstructional error is clearly erroneous when "'the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' [Citation omitted.]" *State v. Owens*, 314 Kan. 210, 235, 496 P.3d 902 (2021). Based on our review of the record on appeal, we are not so convinced.

As addressed in the previous section of this opinion, there was sufficient evidence presented at trial on which the jury could rely to convict Wilson of aggravated endangering a child. In particular, there is sufficient evidence in the record to show that Wilson pointed a loaded gun at two minor children as he left the house where he had just shot and killed Hill. Consequently, we are not firmly convinced that a reasonable jury would have convicted Wilson of the lesser offense had the instruction been given. See *Williams*, 295 Kan. at 523-24.

*Accuracy of Journal Entry*

Next, Wilson contends that the district court's sentencing journal entry incorrectly reflects the district court's order at sentencing regarding his monthly restitution payment obligation. The State disagrees and contends that the journal entry conforms with the orders entered by the district court at the sentencing hearing. In particular, the State argues that the term "costs and fees" as used in the journal entry includes restitution.

In a criminal case, a district court's oral pronouncement from the bench at sentencing controls over the journal entry. As a result, "any journal entry variance from a judge's oral pronouncement during sentencing is a clerical error that may be corrected at any time." *State v. Edwards*, 309 Kan. 830, 835, 440 P.3d 557 (2019). K.S.A. 22-3504(b) provides: "Clerical mistakes in judgments, orders or other parts of the record and errors

in the record arising from oversight or omission may be corrected by the court at any time and after such notice, if any, as the court orders."

Here, we find no clerical mistake that needs to be corrected. This is because the journal entry filed by the district court conforms with the orders entered at the sentencing hearing. A review of the transcript of the sentencing hearing reveals that the district court ordered Wilson to pay the following costs and fees: "I am imposing the BIDS application fee of $100, the KBI lab fee of $400, the DNA database fee of $200, the court costs of $202.50, and $5,000 to the Kansas Crime Victims Compensation Board." The district court then took recommendations from the parties for a payment plan. The district court adopted and ordered Wilson's counsel's suggestion for a $20 monthly payment plan.

The district court's journal entry of judgment filed after sentencing reflects all the costs and fees assessed by the district court, including the $5,000 restitution order. Page five of the journal entry states the district court's order regarding the monthly payment: "Defendant to pay $20 per month toward costs and fees." We find that the $5,000 restitution order is a part of the "costs and fees" imposed by the district court because "Total Restitution" is listed under a subsection titled "Costs Ordered" on page three of the journal entry. Thus, the sentencing journal entry conforms with the district court's oral pronouncement at sentencing.

*Cumulative Error*

Finally, Wilson contends that his convictions should be reversed based on cumulative error. Cumulative trial errors, when considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that a defendant was substantially prejudiced and denied the right to a fair trial. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error

22

must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome. *State v. Alfaro-Valleda*, 314 Kan. 526, 551-52, 502 P.3d 66 (2022).

The cumulative error rule does not apply if there are no errors or only a single error. *Gallegos*, 313 Kan. at 277. Moreover, our Supreme Court recently clarified the cumulative error rule by holding that "unpreserved instructional issues that are not clearly erroneous may not be aggregated in a cumulative error analysis because K.S.A. 2022 Supp. 22-3414(3) limits a party's ability to claim them as error." *State v. Waldschmidt*, 318 Kan. 633, 634-35, 546 P.3d 716 (2024).

In light of our findings and conclusions as set forth in this opinion, we do not find cumulative error. The only error supported by the record relates to the district court's failure to give a misdemeanor endangerment of a child instruction to the jury. But failing to give this instruction was not clearly erroneous, so this error cannot be considered in a cumulative error analysis. See *Waldschmidt*, 318 Kan. at 634-35. Even if the misdemeanor endangering a child instructional error could be considered, this would only be a single error and the cumulative error rule would still not apply. See *Gallegos*, 313 Kan. at 277.

We, therefore, affirm Wilson's convictions and sentence.

Affirmed.