IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,139

STATE OF KANSAS,
*Appellee,*

v.

KAMAHL MATTHEW BOBIAN,
*Appellant.*

SYLLABUS BY THE COURT

1.

A voluntary intoxication instruction is factually appropriate when a defendant presents proof of both consumption of an intoxicating substance and consequent impairment.

2.

A lesser included instruction on reckless homicides can be factually appropriate when there is some evidence that the act that caused death was intentional, but the killing itself was unintentional.

3.

Prosecutors exceed the wide latitude afforded to them by drawing inferences for the jury via "we know" statements, even if the inferences are reasonable.

Appeal from Riley District Court; KENDRA S. LEWISON, judge. Oral argument held May 14, 2025. Opinion filed August 22, 2025. Affirmed and remanded with directions.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David Lowden*, deputy county attorney, argued the cause, and *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.: Kamahl Matthew Bobian killed his wife S.B. early on the morning of September 25, 2021. After a jury convicted him of premeditated first-degree murder, aggravated burglary, and violation of a protective order, he directly appealed to this court. Bobian claims the district court erred by refusing to give the jury certain lesser included offense instructions and a voluntary intoxication instruction. He also argues that the prosecutor repeatedly erred in closing arguments. And he claims the district court erred by failing to pronounce a sentence for his premeditated first-degree murder conviction.

We find no reversible errors and affirm Bobian's convictions. But we agree that the district court failed to pronounce a sentence for Bobian's premeditated first-degree murder conviction, so we remand the matter to the district court to pronounce his sentence.

### FACTS AND PROCEDURAL BACKGROUND

Bobian and S.B. married in 2021. They lived in Manhattan, Kansas, with their two daughters—one about two and a half years old, the other almost one year old—and with S.B.'s seven-year-old son from a previous relationship.

Bobian and S.B. separated in September 2021. On September 16, the district court issued a protection from abuse (PFA) order commanding Bobian to stay away from S.B.'s residence and have no contact with her. Police served the PFA on Bobian the next day.

On September 22, 2021, Bobian sent S.B. several messages via Snapchat, in direct violation of the PFA order. S.B. reported Bobian's messages to the police, who, after investigating, submitted an affidavit to the county attorney's office to obtain an arrest warrant for a PFA violation.

S.B. and the children stayed with a friend for the next few days. Because S.B.'s son had a race to run on the morning of September 25, they all returned home on the evening of September 24. S.B.'s friend spent the night, although she left between 3:30 and 4:00 a.m. to return to her own home. S.B.'s friend locked the front door as she left. S.B. was sleeping in her bed with the two younger girls at the time, while her son was asleep in his room.

For his part, Bobian had been drinking hard liquor since about 11 a.m. on the morning of September 24. Bobian spent the day drinking and returned to a friend's house after a party to retrieve some vodka sometime between 2:00 and 4:00 a.m. on September 25. He characterized himself as very drunk at that time, although his friend said he seemed "coherent," was not "belligerent" or "angry at all," and was not stumbling or incomprehensible.

Only Bobian witnessed much of what came next. Because he provided two different versions of the ensuing events, we discuss each separately.

*Bobian's Initial Version to Police on September 25*

As Bobian initially told an interviewing detective, Bobian walked from his friend's place to S.B.'s house. Bobian and S.B. had had "a lot of disagreements" in the preceding days and he felt that he "was being lied on . . . with, like, the court or with, like, the law, I

3

felt like I was being cheated and disrespected." Bobian knew that he was not supposed to go to S.B.'s residence, but he felt like he "didn't have any last resort at the time and I was drunk and I acted out of spite."

Bobian let himself into the house, where he found S.B. asleep in her room alongside their two daughters. S.B. did not wake up as he entered, and they did not have an argument. Instead, Bobian "just went in, and . . . thought that . . . the best thing for, like, for like my kids and stuff was both of our lives to be messed up." Bobian decided to kill S.B. at the last minute, when he "flicked the light on . . . [and] saw her laying with the kids." Although he told himself, "I don't think I want to do this," and "went back and forth for a second," "something in my mind just . . . just freaking said, 'You've got to do it now,' and then I blacked out and I did it." Placing both hands on the knife that he always carried, Bobian stabbed down at S.B.'s neck once or twice. S.B. said "ow ow" and "please stop" as Bobian "was blacking out"; she started to struggle before falling to the ground while "gurgling and stuff." She then stopped moving and making noise.

Bobian found the keys to S.B.'s van. He left the children at the house while he drove S.B.'s body (along with the bloody blanket and bedding) out near the Timbercreek housing developments; he later gave police directions to where he had left her body. When he returned to the house, he put the two younger children in the van and told S.B.'s son to cover his eyes, as he didn't want the child to see his mother's blood.

*Bobian's Trial Testimony*

At trial, Bobian claimed he hadn't meant to go to S.B.'s residence at all. Instead, after retrieving the rest of his vodka from his friend's place, he intended to walk to another friend's house so they could go lift weights together. But S.B.'s residence was on the way, so when he walked by and saw S.B.'s van parked outside, he decided to stop to

retrieve some of his clothes. When S.B. opened the door, Bobian quickly told her they needed to discuss "something important" "before she could call the cops"—but this was a pretext because, "I just wanted clothes, really." S.B. let Bobian in, then laid back down to "cuddle with the youngest." When S.B. told Bobian that she smelled alcohol, Bobian dropped the pretext and asked for his clothes.

S.B. refused to give Bobian his clothing. Because Bobian believed S.B. had sold some of his clothes, he drew his folding knife and told her he was going to cut the clothes up. S.B. then got up and started striking at him and trying to push him out of the room. As Bobian was "just blocking" S.B., the knife went into S.B.'s neck; then, "the weird thing that is probably gonna haunt me forever is I—I'm pretty sure she smiled at me before she pulled the knife out, and then fell over on to the knife." Though he characterizes the moment as "a blur," Bobian believed the knife stabbed S.B. at most twice. S.B. stumbled backwards toward the bed and landed on the floor, where she stopped flailing.

Bobian was stunned. He only "snap[ped] out of it" when his older daughter called for him from the bed. He placed the girls on a blanket near the kitchen, but the baby tried to follow him back into the room and "was on her butt in blood." Bobian gave both girls a bath and then brought them into the room where S.B.'s son was still asleep. Panicked, Bobian told the children to wait there. He then removed S.B.'s body "to keep them away from the blood and from seeing her."

Somehow, Bobian found the keys to S.B.'s van. Bobian dragged her body to the van and lifted her up to get her inside. Bobian then navigated to a wooded area—while it was still dark out—to dump S.B.'s body before returning to retrieve the children.

5

*Subsequent Developments and Forensic Evidence*

S.B.'s upstairs neighbor heard a voice that sounded like Bobian urgently saying, "Get in the car," sometime between 5:00 and 5:30 a.m. The neighbor heard no children crying, no sounds of struggle, no screaming, and nothing that suggested violence.

At about 5 a.m., when it was still dark out, a resident near the Timbercreek housing developments spotted a vehicle's taillights in the pasture. After finding "a whole bunch of trash" and a bundle around a blanket that had been dumped by a wooded area, the resident's nephew called the police. Following this information, police found S.B., deceased, inside a pile of bedding at the bottom of a hill. Her body was about 7 miles from her home.

An autopsy identified seven sharp force injuries to S.B.'s neck, upper chest, and head: four stab wounds, three cutting wounds. One of the stabs severed S.B.'s trachea, which would have filled her lungs with blood and likely kept her from screaming. The autopsy also found no defensive wounds that might have indicated a struggle, although there were injuries consistent with her body being dragged.

Shortly after the killing, Bobian called his father to say that he had done "the unthinkable" and asked his father to "[t]ake care of my kids. I'm leaving." Bobian's father went to S.B.'s house to look for the children, where he "could kind of see what had happened." He called Bobian again, which is "when [Bobian] told me he got drunk and killed [S.B.]" and that he had taken her to Timbercreek. Bobian's father then called the police.

The police found a grim scene. Fresh, bloody drag marks, 2 to 3 feet wide, extended from the front door to the curb. Inside, the carpet near the front door was bloody. The front door was unlocked, with no sign of forced entry, and a step ladder was propping open the screen door.

Although the house was messy and bloody, investigators saw no signs of a physical struggle. Even in the bedroom, where they found the most blood, there was no blood spatter on the ceiling or walls that might indicate a struggle. Other than some blood on a child's playpen, most of the blood in the bedroom was on the floor. Although S.B.'s friend testified that there had been bedding on the bed the night before, the bed was stripped when police arrived. Investigators also found blood on a light switch in the bathroom, along with a tub full of water and some children's toys.

While the police were speaking with Bobian's father, Bobian's mother called him to report that Bobian had dropped the children off with her. The two youngest girls had been wearing only diapers. None of the children had blood on them. After dropping the children off, Bobian left without saying anything to his mother.

After leaving the children at his mother's place in Manhattan, Bobian tried to drive to Osawatomie to go to the mental institution. Bobian continued to drink vodka and, by his own estimation, drove above 100 mph for some time before crashing into a retaining wall on I-70 in Topeka. When a detective spotted the crashed van while driving by, Bobian was walking away from it while sipping from a vodka bottle.

*District Court Proceedings*

The State charged Bobian with one count of premeditated first-degree murder, one count of aggravated burglary, and two counts of violation of a protection order.

7

At trial, the parties debated an instruction on the lesser included crimes of reckless second-degree murder and involuntary manslaughter, along with a voluntary intoxication defense. As we will discuss below, the district court rejected all three instructions. At the conclusion of trial, the jury returned a verdict of guilty on all counts.

At sentencing, the district court rejected the defense's request for a departure from the hard 50 on the premeditated first-degree murder conviction. The district court also pronounced sentences for the aggravated burglary and for both counts of violation of a protective order; the district court ran the latter two sentences "concurrent with the first-degree murder count," but ran the aggravated burglary sentence consecutive. But, as discussed below, the district court failed to actually pronounce a hard 50 sentence for the premeditated murder count.

Bobian directly appeals.

ANALYSIS

*The district court erred in refusing to give a requested jury instruction on voluntary intoxication.*

Bobian first challenges the district court's refusal to instruct the jury on voluntary intoxication, which he requested. Our standard of review is well settled. When an appellant raises a jury instruction issue on appeal:

> "(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that

8

would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward*[, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

The State concedes that Bobian preserved this argument below. We agree. Normally, any preserved jury instruction error is reversible if we find "a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" 295 Kan. at 168. But Bobian frames the district court's decision as a denial of his constitutional right to present his theory of defense and thus argues that a constitutional harmlessness framework ought to apply. We need not resolve this argument, however. As discussed below, Bobian has correctly identified a prosecutorial error. Under our cumulative error framework, "If any of the errors being aggregated are constitutional in nature"—such as prosecutorial errors—"the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome." *State v. Mendez*, 319 Kan. 718, 741, 559 P.3d 792 (2024). See *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016) (prosecutorial errors evaluated for constitutional harmlessness). Thus, we leave harmlessness for our discussion of cumulative error.

The State also concedes that a voluntary intoxication instruction would have been legally appropriate. Again, we agree. Two statutes govern our analysis. Under K.S.A. 21-5108(c):

"A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt."

9

K.S.A. 21-5205(b) provides that,

> "An act committed while in a state of voluntary intoxication is not less criminal by reason thereof, but when a particular intent or other state of mind is a necessary element to constitute a particular crime, the fact of intoxication may be taken into consideration in determining such intent or state of mind."

While voluntary intoxication is not a defense to general intent crimes, it can negate the intent element required for specific intent crimes such as premeditated first-degree murder. *State v. Craig*, 311 Kan. 456, 464, 462 P.3d 173 (2020). See also *State v. Green*, 311 Kan. 960, 984, 469 P.3d 1228 (2020).

But the instruction's factual appropriateness presents a thornier question. For a voluntary intoxication instruction to be factually appropriate, a defendant must present proof of both consumption of an intoxicating substance *and* consequent impairment. *Green*, 311 Kan. at 984 (quoting *State v. Davis*, 306 Kan. 400, 414, 394 P.3d 817 [2017]). In other words, a district court should instruct on voluntary intoxication when "the evidence, viewed in the light most favorable to [the defendant], shows that [the defendant] was intoxicated to the extent that his ability to form the requisite intent was impaired." *State v. Hernandez*, 292 Kan. 598, 606, 257 P.3d 767 (2011). We

> "'"will not infer impairment based on evidence of consumption alone[,]'" [although,] A loss of memory or inability to remember events before or during the offense may establish the inability to form intent, as can evidence the defendant is '"so impaired that he or she has lost the ability to reason, to plan, to recall, or to exercise motor skills as a result of voluntary intoxication."'" *Green*, 311 Kan. at 985 (quoting *State v. Reed*, 302 Kan. 390, 400, 352 P.3d 1043 [2015]).

10

The parties presented evidence that Bobian consumed a significant amount of alcohol over the day leading up to S.B.'s killing. As Bobian told the interviewing detective, "Basically I felt like I . . . didn't have any last resort at the time and I was drunk and I acted out of spite, I guess. I can't really explain." But the only direct evidence of Bobian's impairment comes from his various references in the interview to "blacking out" just before stabbing S.B.:

- "I blacked out when . . . . I pretty sure I stabbed my wife."

- "I went back and forth for a second . . . and then I blacked out and something in my mind told me 'just do it,' so I . . . yeah. I really don't wanna go through all those . . . all those details."

- "Details are just that she started saying 'Ow,' I remember . . . as I was blacking out, she was saying 'ow' and I was just like . . . basically just, 'please, stop' and then, when I came to, afterwards, driving and stuff, I realized that . . . yeah. Pretty sick."

- "I had been thinking that . . . I didn't want our kids' lives to be ruined but, I hadn't went through with anything like that, . . . and, this night I just got drunk and wasn't thinking, and . . . walked over there and blacked out."

- "I didn't decide that I was going to do it until I flicked the light on . . . saw her laying with the kids, and I went back . . . basically like, I don't think I want to do this, and then . . . something in my mind just . . . freaking said, 'You've got to do it now,' and then I blacked out and I did it."

But although Bobian highlights his claimed lapses in memory and the discrepancy between the number of stab wounds found during the autopsy and the number of times he believed S.B. had been stabbed, almost nothing suggests that Bobian was too impaired to

11

form intent. As the district court summarized, Bobian accomplished many complicated feats before, during, and immediately after the period in which he claimed to have "blacked out"—including walking several blocks to S.B.'s house, filling a bathtub and bathing two small children, gathering bloody bedding, propping open the screen door, finding the keys to S.B.'s van, dragging her body out to the van, loading her *into* the van, driving her several miles away to dump her, then returning, loading all three children into the van, and driving to his mother's residence. And while Bobian's story changed significantly between his interview and his testimony at trial—and while he claimed to have forgotten various matters surrounding S.B.'s death—he ultimately pieced everything together under questioning to provide a coherent narrative of his actions that morning. Or, as the district court put it:

> "Although Mr. Bobian claims that he blacked out, there is not a single portion of that morning that he was not able to describe to [the detective] in detail. He claims to have been highly impaired but the decisions that he made overwhelmingly contradict that self-assessment, and I'm referring to the decisions he made in order to ensure that the children did not see the blood, the steps that he took to transport and conceal the body and the bloody bedding, and the thought process of recognizing that he was suicidal, and decided to drive himself to Osawatomie.

> "The physical feats that he successfully completed further suggest that he was functioning at a level that was not too intoxicated to form the requisite intent. So for the reasons stated above, for the reasons I just stated, the request for the intoxication instruction is denied."

We can understand the district court's skepticism. Even so, the district court overstepped its role by "weigh[ing] the evidence supporting and undercutting the instruction rather than simply determining whether the minimum evidence necessary to require the instruction was present." *State v. Moore*, 287 Kan. 121, 134, 194 P.3d 18

12

(2008). See also *Green*, 311 Kan. at 988 (The district court's role is not to weigh evidence in assessing factual appropriateness, but is rather "merely to detect the presence of any evidence to support the instruction sought; the jury takes it from there.").

Here, instead of focusing on the evidence against Bobian's claim that he "blacked out" in the moments before stabbing S.B., the district court should have considered only whether the evidence of Bobian's impairment—including his statements that he had blacked out—was sufficient. See *State v. Gadelkarim*, 247 Kan. 505, 509, 802 P.2d 507 (1990) (although a "close question," the district court's refusal to instruct on voluntary intoxication was erroneous because "a valid question of controverted facts was presented and the jury should have been permitted to consider it"); *State v. Arreola*, 64 Kan. App. 2d 562, 571-72, 554 P.3d 684 (instruction was appropriate; credibility of evidence was a jury question), *rev. denied* 319 Kan. 834 (2024). And, unlike many cases involving voluntary intoxication instructions, Bobian presented more than just evidence that he consumed alcohol. *State v. Gallegos*, 313 Kan. 262, 270-72, 485 P.3d 622 (2021); *State v. Reed*, 302 Kan. 390, 400-01, 352 P.3d 1043 (2015); *Hernandez*, 292 Kan. at 607; *State v. Brown*, 258 Kan. 374, 386-87, 904 P.2d 985 (1995). Instead, Bobian repeatedly told the interviewing detective that he had consumed alcohol and had "blacked out" before stabbing S.B. Cf. *State v. Moore*, 311 Kan. 1019, 1038-39, 469 P.3d 648 (2020) (two isolated, unexplained references to blacking out insufficient to warrant voluntary intoxication instruction). From that, a jury could theoretically (although not realistically, as we will discuss below) have concluded that Bobian lacked the capacity to form the necessary intent at the time of S.B.'s death.

In short, the parties presented sufficient evidence to send the question of voluntary impairment to the jury. By failing to give the requested instruction, the district court erred. And because we also find errors in other aspects of the trial, we will assess the collective impact of this error alongside all other errors below.

13

*We assume without deciding that the district court erred in refusing to give requested jury instructions on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter.*

Bobian next argues that the district court erred by refusing to instruct the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter. Again, the State concedes that Bobian raised these arguments below and that the instructions would have been legally appropriate.

Our jury instruction error analytical framework again applies here. We assess the factual appropriateness of a requested instruction on a lesser included offense by considering whether there is some evidence that, when viewed in a light most favorable to the defendant, "would uphold a conviction for the lesser offense in the face of a challenge to the sufficiency of the evidence." *State v. Couch*, 317 Kan. 566, 591, 533 P.3d 630 (2023), *abrogated on other grounds by State v. Garcia-Martinez*, 318 Kan. 681, 546 P.3d 750 (2024). And again, although Bobian asks us to review any error for constitutional harmlessness on the theory that a denied jury instruction on a lesser included offense impacted his right to present a defense, we need not resolve this issue now based on our cumulative error analysis below.

An instruction on reckless homicide—which is distinguished by the level of recklessness involved—can be factually appropriate when there is some evidence that the act that caused death was intentional, but the killing itself was unintentional (albeit reckless). *State v. McCullough*, 293 Kan. 970, 979, 270 P.3d 1142 (2012). Cf. *State v. James*, 309 Kan. 1280, 1298-99, 443 P.3d 1063 (2019) (describing distinction between reckless homicides); K.S.A. 21-5403(a)(2) (reckless second-degree murder is the killing of a human being committed "unintentionally but recklessly under circumstances manifesting extreme indifference to the value of human life"); K.S.A. 21-5202(j) (general

14

definition of recklessness). But such instructions are "not appropriate when the only inference supported by the evidence is that the defendant intended to kill his or her victim." *State v. Carter*, 305 Kan. 139, 162, 380 P.3d 189 (2016).

The State argues that Bobian's testimony did not describe reckless conduct since, according to him, he merely drew his knife to cut up his own clothes when S.B. attacked him. But Bobian's description contained more nuance than this framing suggests, and thus we will assume without deciding that the instructions were factually appropriate. As with the district court's error in refusing to give a requested voluntary intoxication instruction, we will reserve our assessment of harmlessness for our discussion of cumulative error, below.

*Any error in the district court's failure to give an unrequested lesser included offense instruction on involuntary manslaughter under K.S.A. 21-5405(a)(2) did not rise to the level of clear error.*

Bobian next argues that the district court should have given an instruction on involuntary manslaughter under K.S.A. 21-5405(a)(2). The State concedes that this instruction would have been legally and factually appropriate based on the underlying charge of violation of a protective order, but correctly argues that Bobian failed to preserve it below.

We review unpreserved jury instruction errors for clear error, and we exclude such errors from our cumulative error analysis. *State v. Waldschmidt*, 318 Kan. 633, 646, 662, 546 P.3d 716 (2024). We reverse a conviction for clear error only when we are "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." *State v. Williams*, 295 Kan. 506, 516, 286 P.3d 195 (2012).

As discussed above, Bobian's counsel requested instructions on the lesser included offenses on reckless second-degree murder and reckless involuntary manslaughter. The parties tailored their arguments around the question of recklessness, which the district court's analysis mirrored. No party mentioned involuntary manslaughter under K.S.A. 21-5405(a)(2). Nevertheless, Bobian claims that his counsel preserved this issue by issuing a general request for all lesser included offenses.

We disagree. K.S.A. 22-3414(3) requires the party requesting a jury instruction to "stat[e] distinctly the matter to which the party objects and the grounds of the objection." Bobian's trial counsel's reference to the district court's "duty to instruct a jury on any lesser included offense that's established by the evidence" does not satisfy this statutory requirement. A general request for all legally and factually appropriate lesser included offense instructions lacks the specificity K.S.A. 22-3414(3) requires.

We again assume without deciding that the instruction was legally and factually appropriate, as the State concedes. But we have little trouble concluding any error did not rise to the level of clear error. Other than Bobian's trial testimony, no evidence supported any conclusion other than a scenario of premeditated first-degree murder. Everything—from the bloody bedding (suggesting S.B. died in bed, as Bobian originally said, rather than on the ground, as he later testified at trial) to the absence of any signs or sounds of a physical struggle to the number and location of S.B.'s stab wounds to the very timing of the attack—suggests premeditated conduct. And even beyond the overwhelming evidence of premeditation, the district court instructed the jury on the lesser included offense of intentional second-degree murder. If the jury declined to convict Bobian of that lesser crime in lieu of premeditated first-degree murder, we see little possibility it would have opted for an even less severe crime. Thus, the district court's failure to give an unrequested instruction on involuntary manslaughter under K.S.A. 21-5405(a)(2) did not rise to the level of clear error and does not warrant reversal.

16

*The prosecutor erred by using the phrase "we know" to discuss a contested fact.*

Bobian next raises several claims of prosecutorial error. We agree that the prosecutor erred once in closing arguments, though we again defer our assessment of harmlessness for our discussion of cumulative error.

We review claimed prosecutorial errors in two steps. First, we consider whether the prosecutor exceeded their wide latitude in conducting the State's case. *State v. King*, 308 Kan. 16, 30, 417 P.3d 1073 (2018). We do not consider any statement in isolation, but look instead to the context to determine whether an error occurred. *State v. Timley*, 311 Kan. 944, 949-50, 469 P.3d 54 (2020).

Second, if error is found, the State must show that "'there is no reasonable possibility that the error contributed to the verdict.'" *State v. Blevins*, 313 Kan. 413, 428, 485 P.3d 1175 (2021); *King*, 308 Kan. at 30. We may consider the district court's jury instructions and the strength of the evidence against the defendant in determining whether any prosecutorial error is harmless. *Blevins*, 313 Kan. at 436-37. But the strength of the evidence is not our primary focus, and we may find prejudice even in strong cases. *Sherman*, 305 Kan. at 111 (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 240, 60 S. Ct. 811, 84 L. Ed. 1129 [1940]).

We do not require parties to contemporaneously object to claimed prosecutorial errors to preserve them for appeal, although we may consider whether the parties objected as we assess each error. *Timley*, 311 Kan. at 949.

*The prosecutor erred once by saying "we know" when discussing a contested fact.*

Bobian highlights several instances where the prosecutor said "we know" or "you know" during closing arguments:

- "Mr. Bobian intentionally killed [S.B.]. We know that happened."

- "We know that she had seven, at least seven stab wounds."

- "[Y]ou know that he had the motive."

- "You know he had the intent. You know what he did."

- "And you know that he made that decision [that he's going to kill her], ladies and gentlemen, because he said it."

"[A] prosecutor's use of 'we know' is acceptable when it 'does not indicate [the prosecutor's] personal opinion, but demonstrates that the evidence was uncontroverted.'" *King*, 308 Kan. at 34 (quoting *State v. Corbett*, 281 Kan. 294, 315, 130 P.3d 1179 [2006]). But prosecutors exceed the wide latitude afforded to them by drawing inferences for the jury via "we know" statements, even if the inferences are reasonable. *King*, 308 Kan. at 34. See also *State v. Brown*, 316 Kan. 154, 168-69, 513 P.3d 1207 (2022); *State v. Alfaro-Valleda*, 314 Kan. 526, 544-45, 502 P.3d 66 (2022); *Blevins*, 313 Kan. at 432.

Of the alleged errors Bobian identifies, trouble arises in only the first: "Mr. Bobian intentionally killed [S.B.]. We know that happened." The trial revolved around Bobian's intent. By telling the jury "we know" (and with it, the implied "I know"), the prosecutor erroneously expressed a personal opinion about a core contested element of the case.

But the remaining statements did not fall outside the prosecutor's wide latitude. As to the only other "we know" statement, Bobian claims that the defense controverted the number of stab wounds because he testified that S.B. was only stabbed once or twice. But

the prosecutor did not say, "We know *Bobian stabbed S.B.* seven times," which would have involved a controverted fact. Rather, the prosecutor said, "We know that she had seven, at least seven stab wounds." Regardless of Bobian's subjective recall, the autopsy confirmed that S.B. had seven stab wounds. The prosecutor did not err in saying so.

The remaining statements all involve the words "you know," not "we know." We have previously treated such phrases similarly. E.g., *State v. Douglas*, 313 Kan. 704, 714, 490 P.3d 34 (2021). But the two are not synonymous. However innocently intended, "we know" is a semantic Trojan horse that conceals the implied "*I* know," which forms the nucleus of the prosecutorial error. Cf. *King*, 308 Kan. at 34. In contrast, even when a prosecutor employs "you know" to emphasize the strength of the evidence presented, the "you know" formulation keeps the focus squarely on the *jury's* judgment—not the prosecutor's personal opinion. Cf. *Carter*, 305 Kan. at 150. In short, the same concerns that underlie "we know" statements do not necessarily apply to those involving "you know." We find no error in the "you know" statements here.

As before, we will defer any assessment of the harmlessness of the prosecutor's sole error for our discussion of cumulative error, below.

*The prosecutor did not inject a personal opinion in discussing Bobian's motivation.*

Bobian next claims the prosecutor expressed a personal opinion by telling the jury, "Ladies and gentlemen, *if that doesn't tell you* why he brutally murdered, drug her lifeless, naked body out, put her in a van, took her away from her own children and dumped her, *I don't know what does*." (Emphases added.) In context, the "that" to which the prosecutor referred was, "[T]he very first thing he said about killing his wife, do you remember? He said, I did it out of spite. Out of spite."

19

"A prosecutor may argue the evidence demonstrates a defendant is guilty so long as the prosecutor does not state his or her personal opinion regarding the ultimate guilt or innocence of the defendant." *King*, 308 Kan. at 30. See also *State v. Charles*, 304 Kan. 158, 175, 372 P.3d 1109 (2016) (characterizing repeated uses of "I think" as "mere verbal tics," but placing future prosecutors "on notice that any temptation to say 'I think' should be rebuffed and replaced with 'the evidence shows' or 'I submit' or a similar, less potentially subjectively loaded phrase"), *abrogated on other grounds by State v. Huey*, 306 Kan. 1005, 399 P.3d 211 (2017).

The State correctly argues that there is little real difference between what the prosecutor said and any alternative formulation involving "I submit that." We agree. In context, the prosecutor seems to have meant: "The clearest evidence of Bobian's motivation can be found in his own words: 'I did it out of spite.'" While the prosecutor could have used a more artful rhetorical formulation that took himself completely out of the picture, we do not detect an improper personal opinion here.

*The prosecutor did not misstate the law.*

Finally, Bobian claims the prosecutor misstated the law by telling the jury:

"And you may say, well, there's a second intentional. You don't even get there. You start at the top. You start at premeditation. It's only if 12 of you are not unanimous that you even look at second intentional. But ladies and gentlemen, the evidence in this case tells you that it's premeditation, and if you find that, you don't even look at second intentional. You shouldn't look at it, if you find it."

Bobian acknowledges that this court has sanctioned similar arguments in *State v. Scott-Herring*, 284 Kan. 172, 179, 159 P.3d 1028 (2007). But he asks us to reconsider that holding in light of the following language from K.S.A. 21-5108(b): "When there is a reasonable doubt as to which of two or more degrees of a crime the defendant is guilty,

20

the defendant shall be convicted of the lowest degree only." Bobian effectively argues that the jury must always consider all the lesser versions of each offense before selecting the appropriate verdict, rather than starting with the most serious crime and working its way down the list.

We find no error. The prosecutor's argument accurately tracked another jury instruction, which told the jury, "If you do not agree that Mr. Bobian is guilty of murder in the first degree in Count 1, you should then consider the lesser included offense of murder in the second degree." This instruction mirrors those we sanctioned in *State v. Sims*, 308 Kan. 1488, 1498-99, 1504-05, 431 P.3d 288 (2018), which rejected a "simultaneous consideration" rule for lesser included offense jury instructions. Nor did the prosecutor's argument contradict the relevant portion of K.S.A. 21-5108(b), which was included in another jury instruction. After all, only the element of premeditation distinguishes premeditated first-degree murder from intentional second-degree murder. E.g., *State v. Stanley*, 312 Kan. 557, 565, 478 P.3d 324 (2020). If the jury had a reasonable doubt as to premeditation, the instructions commanded it to move on to intentional second-degree murder. But if the jury *had* no reasonable doubt as to premeditation, the law required no such consideration, as the prosecutor correctly said. A prosecutor who correctly states the law does not err, and thus we find no error here.

*Cumulative error did not deprive Bobian of a fair trial.*

Finally, Bobian argues that cumulative error deprived him of a fair trial.

"Cumulative trial errors, considered collectively, may require reversal when the errors, under the totality of the circumstances, substantially prejudiced a defendant and denied a fair trial. When we review a cumulative error claim, several well-established standards guide us. First, we examine the errors in context, considering whether the

21

district court judge addressed any error; the nature and number of errors; the relationship, if any, between the errors; and the strength of the evidence. Second, we apply the constitutional harmless error test of *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967), if, as here, any of the errors are constitutional. Finally, under the *Chapman* test, the party benefitting from the error, here the State, 'must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome.' [Citations omitted.]" *Alfaro-Valleda*, 314 Kan. at 551-52.

Because prosecutorial error is constitutional in nature, we assess the cumulative effect of all other errors for constitutional harmlessness. But, in assessing cumulative error, we do not consider unpreserved jury instructional errors unless they are clearly erroneous. *Waldschmidt*, 318 Kan. at 662. Thus, any error in the district court's failure to sua sponte instruct the jury on involuntary manslaughter under K.S.A. 21-5405(a)(2) plays no part in our analysis.

We have concluded that the district court erred in not giving a requested instruction on voluntary intoxication and have assumed error in the district court's refusal to instruct the jury on the lesser included offenses of reckless second-degree murder and reckless involuntary manslaughter. We have also found a single prosecutorial error in the prosecutor's use of "we know" to discuss Bobian's intent in killing S.B.

All four errors orbited the question of Bobian's culpable mental state at the time of S.B.'s killing, which was perhaps the central issue at trial. For instance, although voluntary intoxication is a defense to premeditated first-degree murder, it is not a defense to reckless homicide. *State v. Claerhout*, 310 Kan. 924, 937, 453 P.3d 855 (2019). Nevertheless, while evidence of intoxication may be relevant to prove recklessness, Bobian's testimony did not tie his intoxicated state to the allegedly reckless act of drawing the knife during an argument—especially given his testimony that S.B. effectively impaled herself on his knife. 310 Kan. at 937-38. Indeed, Bobian presented

22

almost no evidence of reckless conduct, as the parties' lengthy debate during the jury instruction conference suggests. To find Bobian guilty of reckless second-degree murder or reckless involuntary manslaughter, the jury would have had to ignore all the evidence of premeditation. It would also have had to accept Bobian's story that, after stopping by S.B.'s house at 5 a.m. to retrieve clothing (while on an unrelated walk to a friend's house to go lift weights), he had lawfully drawn his knife to cut up that clothing when S.B. effectively killed herself on his knife. We see no reasonable possibility that the jury would have walked this gossamer tightrope.

Likewise, overwhelming evidence undermines the theory that Bobian was so impaired he could not form intent. As discussed, Bobian's actions before, during, and after S.B.'s murder—along with the great number of details he provided, suggesting a near-total recall—completely undermined his references to "blacking out." And the context of some of those references suggests less that Bobian had "blacked out" and more that he did not *want* to revisit the details of S.B.'s death during the interview, i.e., "I went back and forth for a second . . . and then I blacked out and something in my mind told me 'just do it,' so I . . . yeah. I really don't wanna go through all those . . . all those details." Which is understandable: "all those details" provided overwhelming evidence that Bobian entered S.B.'s home (which he knew he was prohibited from) before dawn and, with premeditation, stabbed her to death while she slept beside their two daughters, then disposed of her body in the woods.

In summary, overwhelming evidence supported the conclusion that Bobian was not too impaired to form intent and that, on the contrary, he acted with premeditation in murdering his wife. We conclude that the cumulative effect of these errors did not deny him a fair trial, and thus we affirm his convictions.

*The district court's failure to pronounce a sentence for Bobian's premeditated first-degree murder conviction requires a remand.*

Finally, Bobian claims that the district court's failure to pronounce sentencing for his premeditated first-degree murder conviction constitutes an ambiguous, illegal sentence under K.S.A. 22-3504(c)(1). We exercise unlimited review over claimed illegal sentences, which a party can raise at any time while a defendant is serving the sentence. K.S.A. 22-3504(a); *State v. Claiborne*, 315 Kan. 399, 400, 508 P.3d 1286 (2022).

Prior to sentencing, the defense asked the district court to find substantial and compelling reasons not to impose the hard 50 sentence for Bobian's premeditated first-degree murder sentence and to instead impose the hard 25. See K.S.A. 21-6620(c)(1)-(2); K.S.A. 21-6623. The district court denied this motion at sentencing. But while the district court said, "I do not think that those mitigating circumstances . . . rise to the level of being substantial and compelling circumstances to justify departing from the Hard 50" (and later repeated a similar thought, with an additional erroneous mention of "the Hard 40 sentence"), the district court never actually pronounced a sentence for Bobian's premeditated first-degree murder conviction.

In *State v. Hill*, 313 Kan. 1010, 1015-16, 492 P.3d 1190 (2021), and again in *State v. Juiliano*, 315 Kan. 76, 504 P.3d 399 (2022), we emphasized that we evaluate "the meaning of a sentence based on the context of the entire sentencing hearing." 315 Kan. at 81. But in both *Hill* and *Juiliano*, the district court actually pronounced a sentence. *Juiliano*, 315 Kan. at 80; *Hill*, 313 Kan. at 1012. In contrast, the district court here only rejected the defense's request that it impose the hard 25; it did not actually go on to pronounce the hard 50. Whatever the district court meant to do, we cannot evaluate the meaning of a sentence if there was no sentence. We thus remand the matter to the district court to pronounce a sentence for Bobian's premeditated first-degree murder conviction.

24

CONCLUSION

We affirm Bobian's convictions and remand the matter for the district court to pronounce the sentence for Bobian's premeditated first-degree murder conviction.

Affirmed and remanded with directions.

WILSON, J., not participating.